**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| **KEVIN LEWELLEN, and** )  | |
| **JANET LEWELLEN** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No.  4:05-CV-0083-JDT-WGH** |
| ) | |
| **SCHNECK MEDICAL CENTER** ) | |
| **a/k/a SCHNECK MEMORIAL HOSPITAL,**) | |
| **A. DAVIS, RN, JOHN M. REISERT, MD** ) | |
| **JOHN F. ALEXANDER, MD, and** ) | |
| **SHARON DUFFIELD, RN,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT REISERT'S AND**
**DEFENDANT ALEXANDER'S MOTIONS FOR SUMMARY JUDGMENT**

**Introduction**

This case arises out of the senseless and inexplicable treatment plaintiff Kevin Lewellen

("Mr. Lewellen") received at the hands of certain members of the medical staff of defendant

Schneck Memorial Hospital ("Schneck").   Mr. Lewellen arrived at Schneck's Emergency

Department at approximately 3:05 p.m. in the afternoon on June 8, 2003.  Mr. Lewellen had been

involved in a high speed car crash in which he had rolled his car, the emergency medical

technicians had immobilized him on a backboard, and he was complaining of severe lower back

pain.  Mr. Lewellen also was accompanied by the Indiana State Troopers, as he had been arrested

at the scene of the accident for driving while intoxicated.  Because he was in custody of law

enforcement officials at the time he arrived at Schneck, Mr. Lewellen had a Fourteenth

Amendment right to medical treatment.  This lawsuit arises out of the Defendants' wrongful acts

and omissions that served to deprive Mr. Lewellen of those rights.

Approximately one hour after Mr. Lewellen arrived at Schneck, defendant Dr. Reisert discharged him from the hospital, ignoring Mr. Lewellen's pleas for additional care and the fact that Mr. Lewellen could not stand or walk.  It was obvious to the State Troopers who transported Mr. Lewellen to jail, and to the jailers that received him, that Mr. Lewellen was hurt terribly and should not have been released from the hospital.  Even more outrageous, at the time Mr. Lewellen was discharged from the hospital, the last of the x-rays of his spine—which clearly show an unstable burst fracture of Mr. Lewellen's L2 vertebrae—had not even been developed. As a result, Dr. Reisert discharged Mr. Lewellen from Schneck without being able to clear his spine either clinically or through x-rays.  When Dr. Reisert ultimately reviewed those x-rays (if he ever did), after Mr. Lewellen had been hauled off to jail, Dr. Reisert attempted to cover up his behavior by writing that the x-rays were of poor quality due to lack of patient cooperation and that they revealed no gross fracture.  Dr. Reisert's cover-up efforts notwithstanding, the x-rays clearly show a fracture of Mr. Lewellen's spine.

Defendant Dr. Alexander, the Schneck radiologist who did the second, "quality control," read of Mr. Lewellen's x-rays two hours after Mr. Lewellen was discharged from Schneck, perpetuated Dr. Reisert's misdeeds by (1) drafting a report that attempted to cover for Dr. Reisert by interpreting the x-rays to be inconclusive when they clearly show a fracture, (2) improperly blaming the poor quality of the x-rays on Mr. Lewellen, when he knew that the deficiencies in the x-rays were due to technician errors, and (3) by not alerting Schneck's Emergency Department that Mr. Lewellen had an unstable burst fracture and should be recalled to the hospital, despite the fact that was the primary purpose for his follow-up read of the x-rays.

## **Procedural Background**

Mr. Lewellen and his wife, Janet Lewellen, filed this action, bringing claims under 42 U.S.C. § 1983 against defendants John Reisert, D.O., John Alexander, M.D., Amanda Davis and Sharon Duffield, and bringing a claim against Schneck Memorial Hospital under the federal Emergency Management Treatment and Labor Act ("EMTALA"), codified at 42 U.S.C. § 1395dd. Each of the individual defendants was a member of Schneck's medical staff on June 8, 2003. Because Schneck is owned by an organ of Jackson County, Indiana, a political subdivision of the state of Indiana, the Complaint alleges that each of the individual defendants is a "state actor" for purposes of 42 U.S.C. §1983 and that each of those defendants acted under color of state law. Because Mr. Lewellen was in the custody of the Indiana State Police when he arrived at Schneck, the Complaint alleges that the individual defendants' actions violated Mr. Lewellen's due process right guaranteed by the Fourteenth Amendment to the United States Constitution.

Defendants Reisert and Alexander have each filed a motion for summary judgment raising similar issues. With leave of the Court, Plaintiffs are filing this consolidated response to the motions. As the response explains in detail below, the motions must be denied because there is evidence from which a reasonable fact finder could conclude that defendants Reisert and Alexander acted under the color of state law and that they each exhibited deliberate indifference to Mr. Lewellen's serious medical condition.

## FACTUAL BACKGROUND/STATEMENT OF MATERIAL FACTS IN DISPUTE[1]

Based upon the evidence adduced to date in this case, a reasonable fact finder could find the following facts to be true:

### Kevin Lewellen Crashes His Car, is Arrested, and is Transported to Schneck Memorial Hospital

1.      Plaintiff Kevin Lewellen was involved in a one-car accident early in the afternoon of June 8, 2003.  At the time, Mr. Lewellen was traveling on I-65 near Seymour, Indiana.  Mr. Lewellen's car left the roadway at a high rate of speed and his vehicle rolled once before coming to a rest in a ditch approximately 50-100 yards off the roadway.  *See*  Exhibit 1, Jackson County EMS Run Sheet.

2.      Shortly after the accident, two Troopers from the Indiana State Police were dispatched to the accident scene, and Kevin Lewellen was arrested for operating a motor vehicle under the influence of alcohol.  *See* Exhibit 2, Complaint and Summons; Exhibit 3, Probable Cause Determination from Jackson County, Indiana Superior Court.

3.      The Jackson County Emergency Medical Service, which was owned and operated by Jackson County, Indiana, was called to the scene.  Upon arrival, they determined that Mr. Lewellen's chief complaint was lower back pain.  The EMT's placed Mr. Lewellen on a spine board in order to immobilize him for transport to the hospital.  *See* Exhibit 1, Jackson County EMS Run Sheet.

---

[1]      As the extended recitation of facts makes clear, Plaintiffs do not generally take issue with the Defendants' statements of material facts.  The major problem with the Defendants' recitations of the facts is that they are incomplete.  Therefore, Plaintiffs have submitted an extended recitation of the facts material to the issues raised by Defendants' motions.  In keeping with the Local Rules, Plaintiffs have used the heading "Statement of Material Facts in Dispute." However, most of the facts come straight from the depositions of the Defendants and from Mr. Lewellen's medical records, and as such, are not actually subject to dispute.

4.      Mr. Lewellen was transported to the Schneck Memorial Hospital Emergency Department, where he arrived at approximately 3:00 p.m.  *See id.*  Mr. Lewellen was transported without incident.  *See id.*  Before Mr. Lewellen arrived at Schneck, the EMT's drew blood from Mr. Lewellen, at the State Troopers' request, in order to determine Mr. Lewellen's blood alcohol content.  Exhibit 14, Affidavit of Trooper Roger Drew at ¶ 3.

5.      Trooper Hudson, the Indiana State Trooper who issued the Summons and Complaint to Mr. Lewellen at the accident scene, accompanied Mr. Lewellen to Schneck and signed Schneck's ER Chart.  *See* Exhibit 4, Reisert Depo. at 113.

### Lewellen's Brief Stay in the Schneck Emergency Department

6.      Defendant Amanda Davis, who was a registered nurse staffing Schneck's Emergency Department when Mr. Lewellen arrived, signed to receive Mr. Lewellen and performed the initial assessment on Mr. Lewellen.  *See* Exhibit 5, Davis Depo. at 18, 36-37, 44, 92.

7.      At the time, Ms. Davis was five months into a high-risk pregnancy.  Exhibit 5, Davis Depo at 99-100.  The father of the child was defendant John Reisert, D.O.  Exhibit 4, Reisert Depo. at 9.[2]

---

[2]     Remarkably, every healthcare professional who provided care to Kevin Lewellen on June 8, 2003—the individual defendants Davis, Duffield, Reisert and Alexander, plus x-ray technicians Charles Barbour and Kelly Wehner—professed having no recollection of Mr. Lewellen's visit to Schneck, despite the extreme notations several of them made in the chart. Exhibit 5, Davis Depo. at 13-15; Exhibit 6, Duffield Depo. at 15-16; Exhibit 4, Reisert Depo. at 50-51; Exhibit 7, Alexander Depo. at 10; Exhibit 8, Barbour Depo. at 7; Exhibit 9, Wehner Depo. at 10.  While the healthcare professionals directly involved in Mr. Lewellen's stay at Schneck professed no recollection of those events, Dr. Neil Staib, Medical Director of Medical Imaging at Schneck, recalled the events, even though he learned about what happened only the morning after.  In contrast to the medical professionals, the law enforcement officers who were forced to witness the Defendants' inhumane treatment of Mr. Lewellen vividly recall these tragic events.

8.    Defendant Davis was provided a copy of the EMS Report, and she noted on the ER Chart that Mr. Lewellen had been involved in a motor vehicle accident as a restrained driver, that his vehicle's airbag had deployed, and that he was complaining of lower back pain.  Exhibit 10, Schneck ED Record at 002.

9.    After defendant Davis assessed Mr. Lewellen's condition and notated the chart, defendant Dr. Reisert examined Mr. Lewellen.  Dr. Reisert was provided a copy of the EMS run sheet, which detailed the seriousness of Mr. Lewellen's accident, and he also had the ER chart containing Defendant Davis's notes.  Exhibit 4, Reisert depo. at 67.

10.   Dr. Reisert noted that Mr. Lewellen had presented with a chief complaint of low back pain, and his examination revealed that Mr. Lewellen's lumbar spine was tender.  Exhibit 10, Schneck ED Record at 002-003.  Dr. Reisert learned from the emergency medical technicians that Mr. Lewellen had been involved in a high-speed crash and that Mr. Lewellen had been complaining of severe lower back pain at the scene of the accident.  Exhibit 4, Dr. Reisert depo. at p. 68.  Dr. Reisert ordered x-rays of the lumbar and cervical spine to determine whether Mr. Lewellen had fractured his back during the accident.  Exhibit 10, Schneck ED Record at 002, 004, 010, 013, 019.  More particularly, Dr. Reisert initially ordered five views of the cervical spine and AP and lateral views of the lumbar spine.  *Id.*

**X-Rays of Lewellen's Spine are Taken**

11.   After Mr. Lewellen was transported to Schneck's x-ray department, x-ray technicians Charles Barbour and Kelly Wehner started by taking  (1) an AP (anterior to posterior) view of the cervical spine; (2) a cross table lateral view of his cervical spine; (3) an odontoid (a shot of some of the bones in Mr. Lewellen's mouth); and (4) an AP view of the

lumbar spine.  Exhibit 9, Wehner depo. at 69-70.  Each of those x-rays was taken while Mr. Lewellen was lying flat on his back.  *Id.* at 51-52.

12.     The films from those views were good quality shots with nothing to suggest that Mr. Lewellen was uncooperative, even on the odontoid, which required Mr. Lewellen to hold his mouth open.  Exhibit 7, Alexander depo. at 98, 102-105; Exhibit 11, Dr. Staib depo. at 76; Exhibit 9, Wehner depo. at 51-52; Exhibit 8, Barbour depo. at 23-24, 30, 34-35.

13.     After those films were shot, the x-ray technicians attempted to roll Mr. Lewellen 45 degrees on his side in order to take the cervical oblique views.  Exhibit 9, Wehner depo. at 69-70.  Mr. Lewellen recalled that an attempt was made to roll him up on his side and that it caused him excruciating pain.  Exhibit 12, Lewellen depo. at 64-66.  Attempting to position Mr. Lewellen in that way would have been very painful.  Exhibit 9, Wehner depo. at 85.

14.     During the course of the x-rays, Dr. Reisert's order was modified to eliminate the cervical obliques.  Exhibit 10, Schneck ED Record at 010, 019.  The technicians could not modify Dr. Reisert's order without his permission, so they had to have secured Dr. Reisert's permission to modify the order and delete the oblique views.  Exhibit 9, Wehner depo. at 42-43.  On the x-ray record documenting the modification of the order, Mr. Barbour made the notation "uncooperative made threats to staff."  Exhibit 10, Schneck ED Record at 010.  Given that Mr. Lewellen had a burst fracture of his spine, his outburst was not surprising; to the contrary it was a clear clinical sign of Mr. Lewellen's fracture.  Exhibit 13, Affidavit of Dr. David Schwartz at ¶ 4.

15.     The x-ray technicians concluded by taking a lateral view of Mr. Lewellen's lumbar spine, which required Mr. Lewellen to be rolled 90 degrees on to his side.  Ex. 9, Wehner depo. at 58.  That x-ray was of poor quality.  Although Mr. Barbour attempted to blame the poor

quality on Mr. Lewellen's lack of cooperation, Defendant Dr. Alexander and Dr. Staib, the Chief of Radiology at Schneck Memorial, both acknowledged that the problems with the lateral lumbar images were a result of the technicians' failure to properly calibrate the exposure to account for Mr. Lewellen's large body size and the fact that Mr. Lewellen was not properly positioned on the x-ray table.  Exhibit 7, Alexander depo. at 84-87, 114 & 119; Exhibit 11, Staib depo. at 92, 94-95.

**Lewellen's Blood Alcohol Level is Reported and Lewellen is Discharged Over His Protests**

16.     At 3:51 p.m., while the x-rays were still being shot, Schneck's lab reported the results of Mr. Lewellen's blood alcohol test, which revealed a blood alcohol level of .297%, nearly twice the level, according to Schneck's lab, at which alcohol can become toxic.  Exhibit 10, Schneck ED Record at 016.

17.     At 4:07 p.m., one hour after Lewellen had arrived at the ER on a backboard complaining of severe low back pain, and before the last of the x-rays of his fractured spine had even been developed, defendant Davis informed Mr. Lewellen that defendant Dr. Reisert had discharged him and she presented him with his discharge instructions. Three minutes later, at 4:10 p.m., he was released from Schneck.  Exhibit 10, Schneck ED Record at 029, 035, 041.

18.     At 4:10 p.m., the same that time that Mr. Lewellen was being discharged from Schneck despite his pleas and protestations to the contrary, the x-ray technicians were developing the final films of Mr. Lewellen's spine.  Exhibit 8, Barbour deposition at 21, 25 & 34.

19.     At some point, Dr. Reisert wrote on the ER Chart that the x-rays revealed no gross fracture and that the films were poor quality secondary to patient cooperation.  Exhibit 10, Schneck ED Record at 002.

20.   When Defendant Davis asked Mr. Lewellen to sign papers at the time of discharge, he signed the discharge instructions but refused to sign the Consent to Treatment, because he explained that he had a terrible pain in his lower back.  When Trooper Roger Drew asked Davis about Lewellen's complaints of pain, Davis informed the Trooper that Lewellen was fine, even though Lewellen could not walk and insisted that he was in severe pain.  Exhibit 14, Affidavit of Trooper Roger Drew at ¶ 7.

21.   No one from Schneck Memorial Hospital contacted Mr. Lewellen's wife to inform her that Mr. Lewellen had been transported to the hospital on a backboard.  Exhibit 15, Janet Lewellen depo. at 14-15.

**Lewellen Is Escorted from Schneck and Transported to the Jackson County Jail**

22.   Contrary to Davis's statements to the Trooper, Lewellen was in severe pain and he could not bear weight.  Instead, it took Davis and both Troopers to place Mr. Lewellen into a wheelchair so that he could be rolled to a State Police cruiser for transport to the jail.  Exhibit 14, Affidavit of Trooper Drew at ¶ 8.  Even then, Mr. Lewellen could not sit properly in the wheelchair.  *Id.*

23.   Defendant Reisert was standing by the doorway to the exam room while Mr. Lewellen pleaded with Defendant Davis and Trooper Drew to not be released from the hospital and while Mr. Lewellen was assisted into a wheelchair and rolled out of the hospital.  *Id.* at ¶ 6.

24.    Despite Mr. Lewellen's pleas for help, the Troopers transported him to jail, because once the hospital had released him from treatment, the Troopers had no choice but to take him to jail.  *Id.* at ¶ 9.

25.      Because Mr. Lewellen was in so much pain, the Troopers varied from their normal procedure and cuffed Mr. Lewellen's hands in front of his body instead of behind his body once they had rolled him to the waiting cruiser. *Id.* at ¶ 9.

26.      Because of Mr. Lewellen's condition, Trooper Drew called ahead to the Jackson County Jail to request assistance in moving Mr. Lewellen from the squad car into the Jail. *Id* at ¶ 11.

27.      Officer Ian McPherson, who was employed as a Deputy Sheriff with the Jackson County Sheriff's Department at the time and who is now a Police Officer with the Seymour, Indiana Police Department, was working at the Jackson County Jail when Mr. Lewellen arrived. He witnessed Mr. Lewellen's arrival via the Jail's closed circuit security system. Exhibit 16, Affidavit of Ian McPherson at ¶ 5.

28.      As Officer McPherson watched and listened, several officers carefully moved Mr. Lewellen out of the cruiser and into a wheelchair. *Id.*  Despite the care those law enforcement officials took, Mr. Lewellen was screaming out in excruciating pain. *Id.*  During the booking process, Mr. Lewellen continued to scream out in pain and he repeatedly asked to be returned to Schneck for additional medical treatment. *Id.* at ¶ 6.

**Defendant Dr. Alexander Reads Mr. Lewellen's X-Rays, Drafts a Cover-Up Report and Takes No Steps to Alert the Emergency Department that Lewellen's Spine Has an Unstable Fracture**

29.      At approximately 6:15 p.m., about 2 hours after Mr. Lewellen had been discharged and transported to the Jackson County Jail, defendant Dr. Alexander read Mr. Lewellen's x-rays and dictated a report of that reading. Exhibit 10, Schneck ED Record at 004-005.

30.    Although Dr. Alexander was not present when the films of Mr. Lewellen's spine were shot, his report made repeated references to problems with the x-rays that he attributed to Mr. Lewellen's purported lack of cooperation with the x-ray technicians.  *Id.*  At his deposition, Dr. Alexander admitted that he simply inferred that the problems with the x-rays were due to Mr. Lewellen's reported intoxication and lack of cooperation.  Exhibit 7, Dr. Alexander depo. at 82-87.  Dr. Alexander further admitted that the problems with the x-rays were that they were over-penetrated.  *Id.* at 86.  And he went on to admit that he speculated that Mr. Lewellen's lack of cooperation may have flustered the technicians, causing them to operate the x-ray machine improperly, resulting in the overexposure.  *Id.* at 86-88.

31.    Dr. Alexander's report stated that Mr. Lewellen's spine had an ossific density left of the L1-L2 disc space that could represent an osteophyte, but that a fracture "cannot be completely excluded."  Exhibit 10, Schneck ED Record at 004-005.

32.    Dr. Alexander testified that the phrase "a fracture cannot be completely excluded" was meant to convey that the odds of a fracture being present on the x-ray ranged anywhere from .1 % to 99.9%.  Exhibit 7, Dr. Alexander depo. at 128-129.   In other words, by his own admission, Dr. Alexander's opinion was that the odds of Mr. Lewellen's spine being fractured could be as high as 99.9%.

33.    Dr. Neil Staib was the Medical Director of the Imaging Department for Schneck Memorial Hospital on June 8, 2003.  Exhibit 11, Dr. Staib depo. at 28.

34.    According to Dr. Staib, the purpose of Dr. Alexander's read was quality control, "in case something is missed."  Exhibit 11, Dr. Staib depo. at 121 & 125.  That is, if there is a discrepancy between the ER physician's read and the radiologist's read, the radiologist needs to communicate it back to the "ordering physician."  *Id.* at 126.  The reason that communication

needs to occur is so that the ER physician can contact the patient and notify them that there is a problem. *Id.* at 126. Dr. Alexander's report was an "abnormal read," a positive result that warranted a call to Schneck's Emergency Department. *Id.* at 130. Dr. Alexander alerted no one.

35.     Contrary to Dr. Alexander's report, Dr. Staib; Dr. David Schwartz, who ultimately operated on Mr. Lewellen's spine; and Dr. Bennie Martin Fulbright, who provided post-operative care to Mr. Lewellen, all agree that an acute burst fracture of Mr. Lewellen's second lumbar vertebrae ("L-2") is clearly visible on the plain film x-rays that were taken at Schneck on June 8, 2003. Exhibit 13, Affidavit of David Schwartz, M.D. at ¶ 2; Exhibit 17, Affidavit of Bennie Martin Fulbright, M.D. at ¶ 7; Exhibit 11, Dr. Staib depo. at 43-44 & 47-49.

36.     Although Dr. Staib was not on duty on June 8, 2003, when he arrived at the hospital on the morning of June 9, 2003 and saw Mr. Lewellen's x-rays, and the later CT films that had been taken upon Mr. Lewellen's return to Schneck, Dr. Staib called the Emergency Department to inquire about what had happened. *Id.* at 74. And while the x-rays showed a fracture, Dr. Staib did not amend Dr. Alexander's report because he "was aware of the circumstances of this case" and "he did not want to edit it (Dr. Alexander's report) in any way, shape or form." *Id.*

### Schneck Attempts to Cover Up Lewellen's Spine Fracture

37.     Several hours after Mr. Lewellen had arrived at the Jail, Mr. McPherson went into Mr. Lewellen's cell to check on another inmate who was being unruly. Exhibit 16, McPherson affidavit at ¶ 8. After realizing that Mr. Lewellen was in terrible shape and speaking with the Jail nurse, Mr. McPherson called the Schneck Emergency Department to inquire about Mr. Lewellen's status. *Id.* at ¶ 10.

38.     When he called, Mr. McPherson spoke with Defendant Sandra Duffield, who was on duty as a nurse that evening.  Although Duffield was generally unhelpful, she said she would check with a physician and call McPherson back.  *Id.*

39.     A short time later, Duffield called back McPherson.  Duffield told McPherson that the ER doctor had re-reviewed the x-ray and found an abnormality in one of Mr. Lewellen's vertebrae, but Duffield instructed McPherson not to notify Lewellen.  *Id.*[3]

40.     Upset by Duffield's request that Lewellen not be informed, McPherson took steps to have Mr. Lewellen released on his own recognizance, so that Mr. Lewellen would then be free to request a return to the hospital where he could seek adequate medical care.  *Id.* at ¶ 12.

41.     Officer McPherson ultimately secured Mr. Lewellen's release and arranged for him to be transported back to Schneck.  *Id.* at ¶ 13.

42.     Lewellen arrived back at Schneck early in the morning of June 9, 2003.  A CT scan of his spine revealed that during the interim between his discharge from Schneck and his return to the hospital, a fragment of bone from his burst fracture had displaced and was impinging on his spinal column.   Exhibit 10, Schneck ED Record at 046-047; Exhibit 13, Affidavit of Dr. Schwartz at ¶ 8; Exhibit 17, Dr. Fulbright affidavit at ¶8.

### Lewellen's Transfer to Methodist Hospital

43.     A short while later, Mr. Lewellen was transported via ambulance from Schneck to Methodist Hospital in Indianapolis, where Dr. David Schwartz operated to remove displaced

---

[3]     In 2005, after this lawsuit was filed, defendant Duffield called Officer McPherson and became upset that he had informed people of the statements she had made.  Exhibit 16, McPherson affidavit at ¶ 14.  Incredibly, in her deposition Duffield denied any recollection of the events of June 8-9, 2003, and she specifically denied having any subsequent conversations about the case with anyone, specifically including no conversations with anyone from the Jail.  Exhibit 6, Duffield deposition at 26-27.

bone fragments, stabilize the fracture site, and decompress the nerves of the cauda equina. Exhibit 18, Operative Notes from Dr. Schwartz.

## Lewellen's Permanent Impairments

44.    Mr. Lewellen has sustained permanent neurological defects as a result of the displacement of his fracture following his initial, involuntary, discharge from Schneck.  Exhibit 17, Affidavit of Dr. Fulbright at ¶ 15; Exhibit 12, Kevin Lewellen depo. at 14-29.

## Schneck Memorial Hospital Is a Government-Owned Hospital

45.    Shneck Memorial Hospital is owned by an arm of Jackson County, Indiana, which is a political subdivision of the State of Indiana.  Exhibit 19, Indiana State Department of Health Hospital Consumer Report for Schneck Memorial Hospital.

## DISCUSSION

**THE COURT SHOULD DENY REISERT AND ALEXANDER'S MOTIONS FOR SUMMARY JUDGMENT.[4]**

**A.    Summary judgment standard.**

A party moving for summary judgment faces a high hurdle, for as the Court is aware, summary judgment is proper only when "there is no genuine issue as to any material fact" and the record demonstrates that " the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether or not summary judgment is appropriate, "Courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party."  *Donnelly v. Chi. Park Dist.*, 417 F. Supp. 2d 992,

---

[4]    Dr. Reisert also moved the Court for summary judgment on Plaintiffs' EMTALA and state law claims against him.  Plaintiff has brought no such claims against Dr. Reisert.  Schneck is the only defendant in Plaintiffs' EMTALA claims, and the Complaint brings no state law claims.

998 (N.D. Ill. 2006)(quoting *Matsushita Electric Industries v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  That is a burden defendants Reisert and Alexander cannot meet.

**B.     Liability under 42 U.S.C. § 1983.**

42 U.S.C. § 1983 provides a vehicle for redress for citizens who have been deprived of their constitutionally protected rights.  42 U.S.C. § 1983.  The elements Mr. Lewellen must meet are: (1) he had a constitutionally protected right; (2) he was deprived of that right; (3) the defendants intentionally caused this deprivation; and (4) the defendants acted under color of state law in doing so.  *Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir. 1990).

Pretrial detainees, such as Mr. Lewellen have a due process right, under the Fourteenth Amendment to the United States Constitution, to medical care.  *See, e.g., Walker v. Peters,* 233 F.3d 494 (7th Cir. 2000).  In order to prevail on a due process claim alleging deprivation of constitutionally mandated medical care, a pretrial detainee must demonstrate that officials, including medical professionals, acted with deliberate indifference to a serious medical condition.  *Dunigan v. Winnebago Country,* 165 F.3d 587, 590 (7th Cir. 1999).  Therefore, summary judgment is not appropriate in this case if there are genuine issues of material fact with respect to: (1) whether Drs. Reisert and Alexander were acting under color of state law on June 8, 2003; (2) whether Mr. Lewellen was "in custody" at the time he was treated at Schneck; and (3) whether defendants Reisert and Alexander acted with deliberate indifference to Mr. Lewellen's serious medical condition.

**C.     There is evidence from which a reasonable fact finder could conclude that Drs. Reisert and Alexander acted under color of state law.**

In *West v. Atkins*, the U.S. Supreme Court made clear that physicians who provide medical services to those in the custody of the state are state actors acting under color of state law for purposes of liability under 42 U.S.C. § 1983.  *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct.

2250, 2258, 101 L.Ed.2d 40, 53 (1988).  In *West*, the Court explained that the dispositive issue is not whether a physician is an employee or enjoys a contractual relationship with the state.  *Id.*, 487 U.S. at 55-56, 108 S.Ct. at 2259, 101 L.Ed.2d at 53-54.  Rather, the issue is whether the physician was acting in fulfillment of the state's obligation to provide medical care to the detainee.  *Id.*  Although Drs. Reisert and Alexander did not directly contract with the State of Indiana to provide medical care to pretrial detainees, they were state actors acting under color state law because they provided medical services for Schneck Memorial Hospital, which at the time was owned by an arm of Jackson County, Indiana, a political subdivision of the state of Indiana, and in the course of doing so they provided medical care to Kevin Lewellen, who, while in custody, was transported by the Jackson County EMS, owned by Jackson County, Indiana, to Schneck, at the direction of the Indiana State Police, for medical care.

The United States Supreme Court long ago held that municipalities and other local governmental bodies, including counties, are "persons" within the meaning of 42 U.S.C. § 1983, meaning that employees and other agents of those bodies are "state actors" under 42 U.S.C. § 1983.  *See, e.g., Board of the County Commissioners of Bryan County, Oklahoma v. Jill Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1387-88, 137 L.Ed.2d 626, 638 (1997), *citing Monell v. New York City Dept. of Social Services*, 436 U.S.  658, 689 (1978).  According to the Indiana State Department of Health, Schneck is a county owned hospital.  Exhibit 19, Indiana State Department of Health Consumer Report on Schneck Memorial Hospital.  Therefore, the agents and employees of Schneck are "state actors," and to the extent they act in furtherance of Schneck's mission, they act under "color of state law" for purposes of 42 U.S.C. § 1983.

Although Dr. Reisert was not an employee of Schneck on June 8, 2003, he was the attending physician in the Emergency Department, pursuant to a contractual agreement his

employer had with Schneck.   Dr. Reisert was employed by Jackson County Emergency Physicians, Inc., which contracted with Schneck to provide emergency medicine services to patients who presented to Schneck's emergency room.   Exhibit 4, Dr. Reisert depo. at 13-15. Jackson County Emergency Physicians, Inc. not only provided emergency physicians for Schneck, it also was responsible for maintaining the schedule of physicians to ensure that Schneck's emergency room was adequately staffed with physicians at all times.  *Id.*

Dr. Alexander enjoyed a similar relationship with Schneck on June 8, 2003.   Dr. Alexander contracted with Dr. Staib, who, in turn, had a contract with Schneck to provide radiological services for Schneck.  Exhibit 7, Dr. Alexander depo. at 8 & 10.   Indeed, Dr. Staib testified that while he contracted with Dr. Alexander for Dr. Alexander to provide radiological services for Schneck, Schneck independently approved Dr. Alexander's credentials before he was permitted to provide those radiological services for Schneck.  Exhibit 11, Staib Depo. at 59.

Moreover, Dr. Reisert's testimony establishes that Schneck's medical staff worked in concert with the jail staff in providing care to pretrial detainees.   In particular, Dr. Reisert justified his decision to discharge Mr. Lewellen on the fact that he was releasing Mr. Lewellen to the jail, which constituted a "watched atmosphere."  Exhibit 4, Dr. Reisert depo. at 133.  As Dr. Reisert phrased it, "It's not like I turned him loose with somebody and sent him home."  *Id.* Similarly, Dr. Reisert felt comfortable discharging Mr. Lewellen for transport to the Jackson County Jail because he was aware that the Jackson County Jail's policy was to accept prisoners with blood alcohol levels below .30%.  *Id.* at 109-110.  Finally, in accordance with Indiana Code § 9-30-6-6, Schneck's lab tested the blood sample that the Jackson County EMS had drawn from Mr. Lewellen at the request of the Indiana State Troopers.  Exhibit 14, Affidavit of Trooper Roger Drew at ¶ 3.  Those facts demonstrate that Dr. Reisert, and Schneck, worked in concert

with law enforcement officials in providing medical care to pretrial detainees who the State transported to Schneck for medical care.

For those reasons, a reasonable fact finder could conclude that Drs. Reisert and Alexander were acting under color of state law.

**D.    There is evidence from which a reasonable fact finder could conclude that Mr. Lewellen was in custody on June 8, 2003 when he presented to the Schneck Emergency Department.**

The Seventh Circuit explained in *Salazar v. Chicago* that the test of whether one is in custody, for purposes of determining whether one has a Fourteenth Amendment due process right to medical care from the state, is whether the person is free to leave and seek medical help on their own. *Salazar v. Chicago*, 940 F.2d 233, 237 (7th Cir. 1991) (explaining that "[a]n initial question arises as to whether [the person] was in custody, or, more precisely, free to leave and seek [medical] help on his own."). It is clear that Mr. Lewellen was "in custody" when he arrived at Schneck, because it is clear that he was not free to leave and seek help on his own.

As an initial matter, there is evidence from which a reasonable fact finder could conclude that Mr. Lewellen had been placed under arrest for operating a motor vehicle under the influence of alcohol before he was transported to Schneck. *See* Exhibit 2, Complaint and Summons; Exhibit 3, Probable Cause Determination from Jackson County, Indiana Superior Court (listing time of arrest as 2:22 p.m.).

Even if Mr. Lewellen had not been charged with a crime and arrested at the scene of the accident, there would be sufficient evidence from which a reasonable fact finder could conclude that he was "in custody," in that he was not free to leave Schneck and seek medical help elsewhere. Dr. Reisert admitted in his deposition he was aware that law enforcement officers escorted Mr. Lewellen to Schneck and that those law enforcement officers were waiting to

transport Mr. Lewellen to the Jackson County Jail as soon as Dr. Reisert discharged him. Exhibit 4, Dr. Reisert depo. at 113.  Indeed, defendant Nurse Davis apparently took glee in turning Mr. Lewellen over to the waiting State Troopers.  Exhibit 5, Davis depo. at 68-70.  *See also* Exhibit 14, Affidavit of Trooper Drew at ¶ 5.  From those facts, a reasonable fact finder could conclude that Mr. Lewellen was in custody during his stay at Schneck.

**E.    There is evidence from which a reasonable fact finder could conclude that both Dr. Reisert and Dr. Alexander exhibited deliberate indifference to Mr. Lewellen's serious medical condition.**

In order to meet his burden, Mr. Lewellen must demonstrate that there is evidence from which a reasonable jury could conclude that: (1) Mr. Lewellen's unstable burst fracture was serious, in that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain; and (2) the defendants were "deliberately indifferent," meaning that they knew and disregarded "an excessive risk" to Mr. Lewellen.  *Dunigan v. Winnebago County,* 165 F.3d 587, 590 (7th Cir. 1999).  As the *Dunigan* Court explained, the defendants must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference." *Id.*

**i.     There is evidence from which a reasonable fact finder could conclude that Mr. Lewellen's condition posed a substantial risk of serious injury and infliction of unnecessary pain.**

The proof is uncontroverted that Mr. Lewellen suffered both excruciating pain and permanent neurological and other impairments as a result of Dr. Reisert's decision to discharge Mr. Lewellen with an unstable burst fracture and Dr. Alexander's decision to take no steps to alert responsible members of Schneck's ER staff that Mr. Lewellen had an unstable burst fracture.

Tragically, the defendants' acts and omissions caused Mr. Lewellen to suffer permanent impairments.  Dr. Staib, Schneck's chief of Radiology, admitted that Kevin Lewellen had an unstable burst fracture on June 8, 2003, when he was released from Schneck.  Exhibit 11, Staib depo. at 61-62.  Because that burst fracture was not immobilized, the bone fragments were permitted to displace and impinge on the nerves in Mr. Lewellen's spine.  Dr. Schwartz, who operated on Mr. Lewellen following his transfer to Methodist Hospital in Indianapolis, explained in his affidavit that permitting one with a burst fracture to bend their torso can shift or squeeze fragments of bone into the spinal canal, causing or exacerbating damage to the spinal cord. Exhibit 13, Dr. Schwartz affidavit at ¶ 4.  It is Dr. Schwartz's opinion that the failure to immobilize Mr. Lewellen caused displacement of the fracture, which accounted for the paralysis and bladder dysfunction Mr. Lewellen developed.  *Id.* at ¶ 8.  Similarly, Dr. Bennie Martin Fulbright, an orthopedic surgeon who assumed post-operative care of Mr. Lewellen after he was permitted to return to Tennessee, has also opined that Schneck's failure to immobilize and stabilize Mr. Lewellen's spine led to permanent nerve damage in Mr. Lewellen's spine.  Exhibit 17, Affidavit of Dr. Bennie Martin Fulbright at ¶ 15.

Moreover, the defendants' inexcusable conduct caused Mr. Lewellen to suffer substantial unnecessary pain during the hours following his initial discharge from Schneck.  Trooper Roger Drew testified it was apparent from Mr. Lewellen's words and deeds that he was in pain at the time he was being released from Schneck and transported to the Jail.  Exhibit 14, Affidavit of Trooper Roger Drew at ¶¶ 8 & 9.  Because it was obvious to the Troopers that Mr. Lewellen was in severe pain, they varied from their normal procedures and cuffed Mr. Lewellen's hands in front instead of behind his back.  *Id.* at ¶ 8.  And in recognition of Mr. Lewellen's compromised condition, Trooper Drew called ahead to the Jackson County Jail to request additional assistance

20

in moving Mr. Lewellen from the Trooper's cruiser to the Jail. *Id.* at ¶ 11. At the jail, officer Ian McPherson witnessed Mr. Lewellen's arrival via a closed-circuit security system. Exhibit 16, Affidavit of Ian McPherson at ¶ 5. Despite the care those three law enforcement officials took in moving Mr. Lewellen, Mr. Lewellen screamed out in excruciating pain. *Id.* at ¶ 5.

From that evidence a reasonable fact finder could find that Mr. Lewellen's condition posed a substantial risk of serious injury and the infliction of unnecessary and wanton pain.

ii.     **There is evidence from which a reasonable fact finder could conclude that Dr. Reisert and Dr. Alexander both disregarded an excessive risk to Mr. Lewellen.**

In demonstrating that there is a genuine issue of material fact with respect to whether Dr. Reisert and Dr. Alexander disregarded the excessive risk of harm their acts and omissions posed, Mr. Lewellen is not required to present direct evidence that the defendant physicians were subjectively aware of the risk of harm their acts and omissions posed to Mr. Lewellen. For as the Seventh Circuit has explained, the question whether a defendant "had the requisite knowledge of a substantial risk is a fact question that could be demonstrated by drawing an inference from circumstantial evidence." *Walker v. Peters*, 233 F.3d 494, 49 (7th Cir. 2000). By way of example, the *Walker* Court explained, "a fact finder could conclude that the official was aware of the substantial risk from the very fact that the risk was obvious." *Id.* at 498-499. And in the context of actions against medical professionals, deliberate indifference may be inferred when the medical professional's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole v. Fromm*, 94 F.3d 254, 261-262 (7th Cir. 1996). There is evidence from which a reasonable fact finder could conclude that both Dr. Reisert and Dr. Alexander acted with deliberate indifference.

      **a.**      **There is evidence from which a fact finder could conclude that Dr. Reisert acted with deliberate indifference.**

From the evidence developed through discovery, a reasonable fact finder could conclude that Dr. Reisert acted with deliberate indifference:

<u>First</u>, Dr. Reisert impulsively discharged Mr. Lewellen before all of the x-rays Dr. Reisert had ordered of Mr. Lewellen's spine had been developed, and hence, before he could have reviewed those x-rays and determined whether Mr. Lewellen had a broken back. Dr. Reisert threw Mr. Lewellen out of the hospital shortly after he received a lab report that Mr. Lewellen's blood alcohol level was .297%, nearly four times the legal limit (and twice the toxic level according to Schneck's own lab), and after receiving reports that Mr. Lewellen was being abusive to Schneck staff, potentially including defendant Nurse Davis, who was five months into a high-risk pregnancy with Dr. Reisert's child.[5]

At the time he discharged Mr. Lewellen, Dr. Reisert was aware Mr. Lewellen might have suffered a fracture or other serious injury to his spine. Dr. Reisert had not been able to clinically clear Mr. Lewellen. To the contrary, Dr. Reisert had ordered the x-rays of Mr. Lewellen's spine because Mr. Lewellen had presented to Schneck immobilized on a backboard complaining of severe lower back pain following a high-speed motor vehicle accident in which Mr. Lewellen's car had rolled at least once. Exhibit 4, Dr. Reisert depo. at 68. Dr. Reisert's examination of Mr.

---

[5]      Mr. Lewellen is not required to prove Dr. Reisert's motive for abandoning his role as a physician and effectively throwing Mr. Lewellen out of the hospital. However, the record reveals two distinct possibilities. First, Dr. Reisert may well have been angered by what he considered to be disrespectful or abusive behavior by Mr. Lewellen toward defendant Nurse Davis, who was carrying Dr. Reisert's child. Alternatively, it is possible that Dr. Reisert was angered by Mr. Lewellen's level of intoxication. Dr. Reisert abruptly quit drinking about one year after the events giving rise to this litigation. When asked why he had done so, Dr. Reisert responded that his father was an alcoholic. Exhibit 4, Reisert depo. at 96. Dr. Reisert's personal experiences with the deleterious effects of alcoholism may have played a role in his losing his professional composure.

Lewellen had revealed that Mr. Lewellen's lumbar spine was tender to the touch, even at Mr. Lewellen's elevated level of intoxication.  Exhibit 10, Schneck Emergency Department Record at 002-003.

Some time after Dr. Reisert had ordered the x-rays, the x-ray technicians informed him that Mr. Lewellen had reacted strongly when the technicians had attempted to roll Mr. Lewellen 45 degrees on to his side to take the cervical oblique x-rays, and Dr. Reisert had approved the modification of the x-ray order to eliminate the cervical obliques.  Exhibit 9, Wehner depo. at 42-43.  Dr. Reisert admitted that (a) Mr. Lewellen's reaction in the x-ray room could have been related to pain, (b) he does not know whether it was related to pain or intoxication, and (c) he did not question the x-ray tech in order to determine whether the lack of cooperation was due to pain, intoxication, or some other factor.  Exhibit 4, Reisert depo. at 117-119, 126 & 137.  Rather than make a judgment about whether Mr. Lewellen's lack of cooperation was clinically significant, Dr. Reisert abandoned his medical decision-making and impulsively directed Nurse Davis to discharge Mr. Lewellen before Dr. Reisert even had the benefit of the x-rays he had ordered.[6]

Second, even if a fact finder gave Dr. Reisert the benefit of the doubt and concluded that he actually received the x-rays before discharging Mr. Lewellen, a fact finder could conclude from the evidence that Dr. Reisert deliberately overlooked the burst fracture of Mr. Lewellen's L-2 vertebrae that is clearly visible on the AP view of Mr. Lewellen's lumbar spine.  *See Walker v. Peters, supra,* 233 F.3d at 498-99 (explaining that a fact finder could conclude from the very fact that a risk was "obvious" that the official was aware of that risk).  Drs. Staib, Schwartz and

---

[6]     That conclusion is reinforced by the statements that a Schneck representative made to Methodist Hospital in Indianapolis, where Mr. Lewellen ultimately was transferred.  A Schneck representative informed Methodist that Mr. Lewellen "was released without any intervention due to his behavior."  Exhibit 21, Methodist Hospital Consultation Note from June 9, 2003.

Fulbright have each opined that a burst fracture of the L-2 vertebrae is clearly visible on the AP view of Mr. Lewellen's lumbar spine.  Exhibit 11, Dr. Staib depo. at 43-44 & 47-49; Exhibit 13 Affidavit of David Schwartz, M.D. at 2; Exhibit 17, Affidavit of Bennie Martin Fulbright, M.D. at 7.[7]  A reasonable fact finder could conclude from the obvious presence of the fracture on Mr. Lewellen's x-rays that if Dr. Reisert actually reviewed the x-rays, the only way he could have missed the fracture is if he deliberately overlooked it.

Moreover, there is additional circumstantial evidence that would support that conclusion. The reaction of Dr. Staib, who was the Medical Director of Schneck's Imaging Department on June 8, 2003 and still is in that position today, when he viewed Mr. Lewellen's x-rays on the morning of June 9, 2003, betrays any suggestion that Dr. Reisert simply missed a difficult read. Dr. Staib testified that upon reviewing the x-rays and Mr. Lewellen's later CT scan, he called Schneck's Emergency Department, to speak with Dr. Reisert's superiors, to inquire about what had happened.  Exhibit 11, Dr. Staib depo. at 74.  And while the x-rays showed a fracture, Dr. Staib did not amend Dr. Alexander's ambiguous report because he "was aware of the circumstances of this case" and he "did not want to edit it in any way, shape or form."  *Id.*

Similarly, Dr. Reisert's continued insistence that Mr. Lewellen did not have a fractured spine when he was discharged from Schneck on June 8, 2003, in the face of the otherwise uncontradicted proof that Mr. Lewellen's spine was fractured at the time, supports an inference that Dr. Reisert deliberately ignored, and is continuing to deliberately ignore the compelling medical evidence, in an effort to justify his impulsive decision to send Mr. Lewellen to jail with a broken back.

---

[7]     The ER physician who was on duty at Schneck on the evening of June 8, 2003 when Mr. McPherson called the Emergency Department was also able to visualize the fracture, based on defendant Nurse Duffield's statements to Mr. McPherson.  *See* Exhibit 16, Affidavit of Ian McPherson at ¶ 10.

Third, there is evidence from which a rational fact finder could conclude that Dr. Reisert deliberately ignored the fact that Mr. Lewellen could not bear weight when defendant Nurse Davis carried out Dr. Reisert's discharge orders.

Dr. Reisert testified at his deposition that he was not aware that Mr. Lewellen could not bear weight at the time of his discharge. Exhibit 4, Dr. Reisert depo. at 151-152. Dr. Reisert further testified that had he been aware that Mr. Lewellen could not bear weight and professed to remain in terrible pain during the time that defendant Davis (Dr. Reisert's pregnant girlfriend) was discharging Mr. Lewellen from Schneck, he would have kept Mr. Lewellen at the hospital for continued observation and other testing. *Id.* And although Dr. Reisert professed ignorance of Mr. Lewellen's inability to bear weight at discharge, Dr. Reisert said he would have expected the nurse to notify him of that finding. *Id.* at 151-153.

Contrary to Dr. Reisert's testimony that his pregnant girlfriend did not notify him that Mr. Lewellen claimed to be in terrible pain and could not bear weight at the time of discharge, there is evidence from which a reasonable fact finder could conclude that Dr. Reisert was standing in the hallway while Mr. Lewellen pleaded for additional medical care and that he witnessed Mr. Lewellen's discharge from Schneck. Exhibit 14, Affidavit of Trooper Drew at 6. From that evidence, a jury could conclude that Dr. Reisert deliberately ignored the obvious clinical evidence that Mr. Lewellen was in severe pain and needed additional medical care when he permitted Nurse Davis to follow through with Mr. Lewellen's discharge.

Fourth, there is evidence from which a rational fact finder could conclude that Dr. Reisert deliberately ignored the risk of harm posed by Mr. Lewellen's excessive intoxication. Schneck's lab reported to Dr. Reisert that Mr. Lewellen's blood alcohol level was .297 %, which was nearly double the level at which alcohol is toxic, according to Schneck's lab. Exhibit 10, Schneck

Emergency Department Record at 016.   Indeed, the United States government has issued guidelines under the federal "Emergency Medical Treatment and Labor Act," 42 U.S.C. 1395 (check cite) ("EMTALA"), the federal statute that prohibits hospitals that receive Medicare funds (including Schneck) from dumping patients who present seeking emergency care, which provide that severe intoxication can render a patient unstable, thereby precluding involuntary discharges of such patients.   *See* Exhibit 20, excerpt from *The EMTALA Answer Book* at 2-4. (Aspen Publishers 2007) (explaining that the federal Center for Medicare Services has stated "that some intoxicated individuals may meet the definition of "emergency medical condition" because the absence of medical treatment may place their health in serious jeopardy or may result in serious impairment of bodily functions or serious dysfunction of a bodily organ.").

While Dr. Reisert's decision to discharge Mr. Lewellen with a potentially toxic blood level constituted disregard of a serious risk of injury, that is not the only alcohol-related risk Dr. Reisert knowingly disregarded.  Dr. Reisert knew that the films the x-ray technicians shot of Mr. Lewellen's spine were of poor quality.  He further knew that the technicians attributed those poor films to Mr. Lewellen's purported lack of cooperation.  Regardless of whether the poor films were due to Mr. Lewellen's lack of cooperation or the x-ray technicians' poor performance, and regardless of whether the problems, if due to Mr. Lewellen, were due to severe pain upon being moved or due to intoxication, Dr. Reisert knew that he had not been able to clear Mr. Lewellen's spine.  Dr. Reisert had ordered x-rays of the spine because he could not clear the spine through his clinical exam, and giving him every benefit of the doubt, he did not have what he considered to be diagnostic quality x-rays that would permit him to clear the spine through that means.  Dr. Reisert knew that Mr. Lewellen had been involved in a high-speed motor vehicle crash, that he had been immobilized at the scene of the accident and that he had presented at Schneck

complaining of severe low back pain.  Dr. Reisert further knew that if Mr. Lewellen had a burst fracture, permitting Mr. Lewellen to move posed a serious risk of harm.  In the face of all that, Dr. Reisert permitted Mr. Lewellen to be hauled off to the jail without warning Mr. Lewellen or the Troopers who were going to transport him to jail of the risks that movement posed to Mr. Lewellen if his spine was fractured.

From that evidence, a reasonable fact finder could conclude that Dr. Reisert deliberately ignored a serious risk that Mr. Lewellen would suffer further harm and needless pain.

> **b.   There is evidence from which a fact finder could conclude that Dr. Alexander acted with deliberate indifference.**

From the evidence developed through discovery, a reasonable fact finder could conclude:

<u>First</u>, that Dr. Alexander dictated a report on Mr. Lewellen's x-rays that attempted to cover up for the failings and misdeeds of Dr. Reisert and the x-ray technicians rather than a report that restricted itself to what the x-rays revealed and that accurately reported what those x-rays revealed.

Dr. Alexander referred in his report on multiple occasions to the fact that Mr. Lewellen's intoxication and lack of cooperation prevented Schneck from securing good quality images. Exhibit 10, Schneck Emergency Department Record at 004.  When he was deposed, Dr. Alexander admitted that he simply inferred that the problems with the x-rays were due to Mr. Lewellen's reported intoxication and lack of cooperation.  Exhibit 7, Dr. Alexander depo. at 82-87.  Dr. Alexander further admitted that the principal problems with the x-rays were that they were over-penetrated, meaning that the technicians had not properly adjusted the settings on the x-ray machines.  *Id.* at 86.  When pressed to explain how Mr. Lewellen's intoxication or lack of cooperation could have prompted the x-ray technicians to improperly set the machines, Dr.

27

Alexander speculated that Mr. Lewellen may have flustered the technicians, thereby causing them to operate the x-ray machine improperly. *Id.* at 86-88. Because Dr. Alexander was forced to admit that the problems with the x-rays were directly attributable to technician error, which he knew when he dictated his report, the jury could conclude that Dr. Alexander knowingly drafted his report in a manner designed to help cover up what actually happened during Mr. Lewellen's first visit to the emergency department.

Even more significantly, Dr. Alexander's report states that Mr. Lewellen's spine had "an ossific density left of the L1-L2 disc space that could represent an osteophyte, but that a fracture cannot be completely excluded." Exhibit 10, Schneck ED Record at 004. At his deposition, Dr. Alexander insisted that he still could not tell from the x-rays whether Mr. Lewellen's spine was fractured. Exhibit 7, Dr. Alexander depo. at 125-126. In contrast, Dr. Alexander's employer, Dr. Staib, testified that a fracture of Mr. Lewellen's L-2 vertebrae is visible on Mr. Lewellen's AP lumbar x-ray. Exhibit 11, Dr. Staib depo. at 43-44 & 47-49. Similarly, Dr. Schwartz and Dr. Fulbright have both testified that the fracture is clearly visible on the x-ray. Exhibit 13, Affidavit of David Schwartz, M.D. at ¶ 2; Exhibit 17 Affidavit of Bennie Martin Fulbright, M.D. at ¶ 7.

More importantly, Dr. Staib's explanation for why the fracture is visible provides further evidence from which the jury could conclude that Dr. Alexander deliberately ignored the visible fracture when he dictated his x-ray report. Dr. Alexander's discussion of the AP lumbar view focuses on an ossific density (bony material) to the left of the L1-L2 disc space. Exhibit 10, Schneck ED Record at 004. However, Dr. Staib testified that the reason why the fracture is obvious on the x-ray is that the endplate line on the top of the L-2 vertebrae is missing. Exhibit 11, Dr. Staib depo. at 47-49. As Dr. Staib explained, it is the absence of the normal structure— the endplate line—that reveals the fracture. *Id.* In contrast to Dr. Staib's explanation, Dr.

Alexander's report carefully avoids any discussion of the endplate line, instead focusing on the ossific density that is visible to the left of the L-2 vertebrae.  Exhibit 10, Schneck ED Record at 002.  Like Dr. Staib, Dr. Alexander knew to look for the endplate line.  From the obviousness of the fracture on the x-rays and Dr. Alexander's omission of any discussion of the missing endplate line a reasonable fact finder could conclude that Dr. Alexander deliberately dictated an ambiguous x-ray report that would help cover up for the fact that Dr. Reisert had discharged Mr. Lewellen with an unstable burst fracture of his spine.

Second, a reasonable fact finder could conclude that Dr. Alexander acted with deliberate indifference in failing to inform anyone in the Schneck Emergency Department or at the Jackson County Jail that the x-rays of Mr. Lewellen's spine had a positive finding.

Dr. Staib testified that the purpose for Dr. Alexander's read of the x-rays (following the initial read by the ER physician) was quality control "in case something was missed."  Exhibit 11, Dr. Staib depo. at 121 & 125.  That is, a primary purpose for the radiologist's read is to determine whether there is a discrepancy between the ER physician's read of the x-rays and the radiologist's read.  Id. at 126.  If the radiologist determines that something was missed, he must communicate that information to the Emergency Department so that the ER physician can contact the patient to notify them there is a problem and ensure they receive appropriate follow up care.  Id. at 126.  Dr. Staib further testified that Dr. Alexander's report was "an abnormal read," which warranted a call to the Emergency Department.  Id. at 130.

Even if a fact finder gave Dr. Alexander the benefit of the doubt and concluded that his failure to visualize the clear fracture of Mr. Lewellen's was the result of mere negligence, they could still conclude from the evidence that Dr. Alexander exhibited deliberate indifference.  A fact finder could reach that conclusion based on Dr. Alexander's failure to notify the Emergency

Department there was some chance (as great as 99.9% according to Dr. Alexander) that Mr. Lewellen had a burst fracture of his spine.  Dr. Alexander knew from the records that Mr. Lewellen had been in a motor vehicle accident.  Exhibit 10, Schneck ED Records at 002, 003.  According to Dr. Alexander, the likelihood that Mr. Lewellen's spine was fractured could be as great as 99.9%.  Exhibit 7, Dr. Alexander depo. at 128-129.  As a physician, Dr. Alexander was aware that fragments from a fracture could move, causing permanent damage and/or pain, if the fracture was not immobilized.  In the face of that knowledge, and fully cognizant of the harms that Mr. Lewellen could suffer if his spine was fractured, Dr. Alexander took no steps to alert the Schneck Emergency Department or anyone at the jail that Mr. Lewellen could well have a very serious injury.  Doing nothing in the face of that information, and in contravention of hospital policy requiring that the ER be alerted, constitutes deliberate indifference to the risk of serious harm that Mr. Lewellen faced as a result of having been discharged with a fractured spine.

From that evidence, a reasonable fact finder could conclude that Dr. Alexander deliberately ignored a serious risk that Mr. Lewellen would suffer further harm and needless pain.

## CONCLUSION

For the reasons set forth above, the Court should deny the Motions for Summary Judgment of Drs. Reisert and Alexander.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By:  */s/ W. David Bridgers*
       Philip N. Elbert, #9430
       W. David Bridgers, #16603
       Kristen V. Dyer, #023610

2000 One Nashville Place
150 Fourth Avenue, North
Nashville, Tennessee 37219
(615) 244-1713 - Phone
(615) 726-0573 - Fax
pelbert@nealharwell.com
dbridgers@nealharwell.com
kdyer@nealharwell.com


**HOPPER BLACKWELL RAMSEY
BURHMEIER, P.C.**

By:  */s/ Christopher C. Hagenow*
       Christopher C. Hagenow, Esq.

Bank One Center/Circle
111 Monument Circle, Suite *452*
Indianapolis, Indiana 46204
(317) 635-5005 – Phone
(317) 634-2501 - Fax
chagenow@hopperblackwell.com

Co-Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served, via the method(s) indicated below, on the following counsel of record, this the 16th day of January, 2007.

| | | |
|---|---|---|
| ( ) | Hand-delivery | Christopher L. Riegler, Esq. |
| ( ) | First Class Mail | Kirk R. Jocham, Esq. |
| ( ) | Facsimile | Hall, Render, Killian, Heath & Lyman, P.S.C. |
| ( ) | Federal Express | One American Square |
| ( ) | E-Mail | Suite 2000, Box 82064 |
| (**X**) | EFS | Indianapolis, Indiana 46282 |

criegler@hallrender.com, triebel@hallrender.com
kjocham@hallrender.com, jshroyer@hallrender.com
*Counsel for Defendants, Schneck, Davis and Duffield*

| | | |
|---|---|---|
| ( ) | Hand-delivery | Edward J. Liptak, Esq. |
| ( ) | First Class Mail | Carson Boxberger, LLP |
| ( ) | Facsimile | 3100 John Hinkle Place, Suite 106 |
| ( ) | Federal Express | Bloomington, Indiana 47408 |
| ( ) | E-Mail | ejl@carsonboxberger.com |
| (**X**) | EFS | *Counsel for Defendant Reisert* |

| | | |
|---|---|---|
| ( ) | Hand-delivery | Anthony J. Yorio, Jr., Esq. |
| ( ) | First Class Mail | Gary J. Clendening, Esq. |
| ( ) | Facsimile | Mallor, Clendening, Grodner & Bohrer, LLP |
| ( ) | Federal Express | 511 Woodscrest Drive |
| ( ) | E-Mail | P. O. Box 5787 |
| (X) | EFS | Bloomington, Indiana 47407-5787 |

ayorio@mcgb.com
gjclende@mcgb.com, lmclain@mcgb.com
*Counsel for Defendant Alexander*

*/s/ W. David Bridgers*