**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| KEVIN LEWELLEN and<br>JANET LEWELLEN, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) Cause No.: 4:05-CV-0083-JDT-WGH <br> ) |
| SCHNECK MEDICAL CENTER a/k/a<br>SCHNECK MEMORIAL HOSPITAL,<br>A. DAVIS, R.N., JOHN M. REISERT, M.D.,<br>JOHN F. ALEXANDER, M.D. and<br>SHARON DUFFIELD, R.N., | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANTS SCHNECK MEDICAL CENTER a/k/a SCHNECK MEMORIAL**
**HOSPITAL, A. DAVIS, R.N., AND SHARON DUFFIELD, R.N.**

Defendants, Schneck Medical Center a/k/a Schneck Memorial Hospital, A. Davis, R.N.,

and Sharon Duffield, R.N., (hereinafter collectively, "Defendants") by counsel, Hall Render

Killian Heath & Lyman, P.C., hereby submit their Memorandum in Support of their Motion for

Summary Judgment.

**INTRODUCTION**

Plaintiffs, Kevin Lewellen and Janet Lewellen, filed a Complaint for an alleged civil

rights violation, pursuant to 42 U.S.C. § 1983, and an alleged violation of the Emergency

Medical Treatment and Labor Act, 42 U.S.C. § 1395dd, in the United States District Court,

Southern District of Indiana, New Albany Division, on June 8, 2005 against Defendants Schneck

Medical Center a/k/a Schneck Memorial Hospital (hereinafter "Schneck Medical Center"), A.

Davis, R.N., (hereinafter "Nurse Davis"), Sharon Duffield, R.N., (hereinafter "Nurse Duffield"),

1

and others. Plaintiffs allege the depravation of Mr. Lewellen's civil rights contending Nurse

Davis and Nurse Duffield were deliberately indifferent to his alleged serious medical needs on or

about June 8 and 9, 2003. Plaintiffs further allege Schneck Medical Center did not provide an

adequate medical screening and stabilization of Mr. Lewellen, during this same time period, in

violation of the Emergency Medical Treatment and Labor Act.

      Schneck Medical Center is a non-profit hospital located in Seymour, Indiana. Nurse

Davis and Nurse Duffield are registered nurses licensed by the State of Indiana. During the

period at issue, they were employed by Schneck Medical Center and helped staff the hospital's

emergency department.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

    1.     On June 8, 2003, Plaintiff Kevin Lewellen was involved in a motor vehicle

accident. *Compl.* ¶ 11.

    2.     Following the accident, Mr. Lewellen was taken by ambulance to Schneck

Medical Center for treatment. *See* Schneck Medical Center's medical records for Kevin

Lewellen, previously filed with the Court by Defendant John Alexander, M.D., in connecting

with his Designation of Evidence in support of his Motion for Summary Judgment (hereinafter

"Schneck Medical Center's Records).

    3.     Upon arrival to Schneck Medical Center, Nurse Davis took Mr. Lewellen's vital

signs as well as noted his treatment prior to arrival and his chief complaint. *Id.*

    4.     Mr. Lewellen was examined by Defendant John Reisert, D.O., an emergency

room physician, who noted the test to determine Mr. Lewellen's ethyl alcohol content was 297.00

mg/dl. *Id.*

    5.     As part of his examination, Dr. Reisert ordered x-rays of Mr. Lewellen's cervical

2

and lumbar spine. *Id.*

6.    While at Schneck Medical Center, Mr. Lewellen became combative and verbally abusive to hospital staff, including the radiology technicians. *Id.*

7.    Despite the efforts of Schneck Medical Center's radiology staff, clear x-rays showing Mr. Lewellen's lower spine could not be obtained. *Id.*

8.    Dr. Reisert's interpretation of Mr. Lewellen's x-rays was there was no gross abnormality indicative of a fracture. *Deposition of John Reisert, D.O.*, 154:8-154:12, taken July 13, 2006, previously filed with the Court by Defendant John Reisert, D.O., in support of his Motion for Summary Judgment (hereinafter "Deposition of Dr. Reisert).

9.    Further, Dr. Reisert found Mr. Lewellen had no neurological symptoms and a totally normal neurological exam. *Schneck Medical Center's Records*; *Deposition of Dr. Reisert*, 154:2-154:7.

10.    Dr. Reisert's clinical diagnosis was ethyl alcohol intoxication and low back pain. *Schneck Medical Center's Records.*

11.    Dr. Reisert ordered Mr. Lewellen to be discharged into the custody of local law enforcement. *Deposition of Dr. Reisert*, 204:12-205:5.

12.    Dr. Reisert did not receive any pressure from law enforcement to release Mr. Lewellen to their custody. *Deposition of Dr. Reisert*, 146:13-146:24.

13.    Moreover, there is no evidence any law enforcement officer or other state actor being involved in the treatment plan of Mr. Lewellen. *See generally, Deposition of Dr. Reisert*; *Deposition of Kevin Lewellen*, taken July 12, 2006, previously filed with the Court by Defendant John Reisert, D.O., in support of his Motion for Summary Judgment.

14.    Nurse Davis followed the orders of Dr. Reisert and took steps to discharge Mr.

3

Lewellen, including providing him with a copy of his aftercare instructions. *Schneck Medical Center's Records.*

15.     At the time of his discharge, law enforcement informed Mr. Lewellen he was under arrest and gave him his Miranda warning. *Deposition of Kevin Lewellen*, 69:7-70:1, 125:23-126:2.

16.     Mr. Lewellen was taken by police to the Jackson County jail on preliminary charges of operating a vehicle while intoxicated. *Id.*, 70:25-71:11; *Jackson County Sheriff's Department records*, previously filed with the Court by Defendant John Alexander, M.D., in support of his Motion for Summary Judgment.

17.     There is no evidence in the contemporaneously kept medical records of Schneck Medical Center that Mr. Lewellen complained of severe lower back pain and repeatedly plead for the Schneck Medical Center staff to keep him in the hospital and provide treatment for his lower back pain during his June 8, 2003 presentation. *Schneck Medical Center's Records.*

18.     Further, the medical records do not indicate Mr. Lewellen was unable to bear weight at the time of his discharge. *Schneck Medical Center's Records.*

19.     During Mr. Lewellen's confinement at the Jackson County Jail, he continued to complain of pain and his back hurt. *Jackson County Sheriff's Department records.*

20.     According to the jail staff, an individual by the name of "Sandra" was contacted at Schneck Medical Center and informed of Mr. Lewellen's situation. *Id.*

21.     "Sandra" instructed the jail staff to bring Mr. Lewellen back to Schneck Medical Center if Mr. Lewellen was still in pain, but to inform Mr. Lewellen to control his abusive behavior. *Id.*

22.     "Sandra" had Mr. Lewellen's x-rays re-examined by the emergency room

physician, who determined Mr. Lewellen had an abnormality in one of his vertebra. *Id.*

23.    "Sandra" called back to the jail staff and informed Officer McPherson of the finding. *Id.*

24.    Steps were then taken to have Mr. Lewellen released on his own recognizance. *Id.*

25.    An ambulance was contacted, and Mr. Lewellen was taken back to Schneck Medical Center. *Schneck Medical Center's Records.*

26.    Mr. Lewellen arrived back at Schneck Medical Center's emergency room at approximately 1:00 a.m., on June 9, 2003. *Id.*

27.    At that time, Nurse Duffield took Mr. Lewellen's vital signs as well as noted his treatment prior to arrival and his chief complaint. *Id.*

28.    The emergency room physician ordered CT scans of Mr. Lewellen's lumbar spine and abdomen and pelvis. *Id.*

29.    These radiology studies revealed Mr. Lewellen had an L2 vertebral burst fracture. *Id.*

30.    Mr. Lewellen was transferred to Methodist Hospital in Indianapolis for further evaluation and treatment. *Id.*

31.    Nurse Duffield's first name is Sharon. *Deposition of Sharon Duffield*, 57:3-21, taken September 13, 2006, attached to Defendants' Designation of Evidence as Exhibit A.

32.    At no time, has Nurse Duffield ever given someone she was speaking with on the phone while working at Schneck Medical Center's emergency room a name other than her actual first name. *Id.*

33.    Mr. Lewellen's medical expenses for his treatment at Schneck Medical Center on

June 8 and 9, 2003 were billed to Anthem Blue Cross. *Schneck Medical Center Patient Account Statements for Kevin Lewellen*, previously filed with the Court by Defendant John Reisert, D.O., with his Reply Memorandum in support of his Motion for Summary Judgment.

## STATEMENT OF LAW AND ARGUMENT

A.    Summary Judgment Standard

Summary Judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A material fact is one that "might effect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party initiating a motion for summary judgment must demonstrate "there is no genuine issue of material fact for trial, and, if that burden is met, the party opposing the motion must come forward with evidence of a genuine factual dispute." *Allstate Ins. Co. v. Barnett*, 816 F.Supp. 492, 494 (S.D. Ind. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The party opposing a motion for summary judgment must set forth specific facts showing there is a genuine issue for trial. *Roberts v. Samardvich*, 900 F. Supp. 594, 600 (N.D. Ind. 1995). "Mere conclusionary assertions, whether made in pleadings or affidavits, are not sufficient to defeat a motion for summary judgment." *Allstate*, 816 F.Supp. at 495 (citing *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007 (7th Cir. 1985)). An issue is genuine only where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Allstate*, 816 F.Supp. at 495 (quoting *Anderson*, 477 U.S. at 248). Summary judgment is thus mandated, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that

party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

B.   Neither Nurse Davis nor Nurse Duffield Violated Mr. Lewellen's Civil Rights Under 42 U.S.C. § 1983.

During the course of discovery in this case, Plaintiffs were asked in interrogatories to state each claimed violation of Mr. Lewellen's civil rights under 42 U.S.C. § 1983 upon which their Complaint is based.  In response, Plaintiffs stated with respect to Nurse Davis and Nurse Duffield,

> ***Plaintiff was in involuntary state custody from the time he was transported from the scene of his automobile accident on the afternoon of June 8, 2003 until he was released on his own recognizance from the Jackson County Jail at shortly after midnight on June 9, 2003.  ***Each of the defendants was during all relevant times a state actor within the meaning of 42 U.S.C. § 1983.  The due process clause of the United States Constitution guarantees that Plaintiff, and all pretrial detainees in state custody, cannot be deprived of needed medical care.  More particularly, the deprivation of such medical care violates the due process clause if state actors exhibit deliberate indifference, defined to include either reckless indifference or actual intent, to a detainee's need for medical care.

> ***Plaintiff presented at the Schneck emergency department at approximately 3:05 p.m. on the afternoon of June 8, 2003. [Defendant] Davis [was a] medical [professional] responsible for providing care to Plaintiff when he presented. Despite Plaintiff's complaints of severe lower back pain and his repeated pleas for Defendants to keep him in the hospital and provide treatment for his lower back pain, Defendants released Plaintiff from the hospital a little more than one hour after he arrived.

> ***Defendants continued with [the plan to discharge Plaintiff] even after it became clear that Plaintiff could not lift himself off of the examination table without assistance and after he had to be transported via wheelchair to the police cruiser.

> ***Officer McPherson of the Jackson County Sheriff's Department recognized that Plaintiff was seriously injured and that his condition was deteriorating. Officer McPherson responded by calling Schneck's emergency department. He spoke with defendant *Sandra* Duffield, a nurse who was working in the emergency department that night.  McPherson explained to Duffield that Lewellen was in tremendous pain and could not move.  Duffield did not offer any suggestions for addressing Lewellen's pain, but she apparently informed the physician who was working in the emergency department about the phone call.

> That physician apparently examined Lewellen's x-rays, because a few minutes later Duffield called McPherson back. She informed McPherson that the emergency department physician had discovered an "abnormality" in one of Lewellen's vertebrae. Acting with intent to deny Lewellen access to needed medical care, Duffield went on to instruct McPherson to not inform Lewellen.

*Plaintiffs' Answers to Defendants' First Interrogatories*, No. 10. (italics added), attached to

Defendants' Designation of Evidence as Exhibit B.

Based upon the evidence before the Court, no genuine issue of material fact exists on the

issue of whether Mr. Lewellen's constitutional rights were violated. Mr. Lewellen has stated

specifically which actions or omissions support his claim of deliberate indifference. The

evidence, however, demonstrates his claims fail for two reasons: 1) Nurse Davis and Nurse

Duffield were not state actors and 2) even presuming they were state actors, the record does not

show a desire on their part to act deliberately indifferent toward Mr. Lewellen's serious medical

needs.

1.      <u>Neither Nurse Davis nor Nurse Duffield were State Actors.</u>

Plaintiffs claim that Nurse Davis and Nurse Duffield violated Mr. Lewellen's civil rights

fails because at no time, during their treatment of Mr. Lewellen, was either Nurse Davis or Nurse

Duffield a "person" within the meaning of 42 U.S.C. § 1983.

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983 (italics added). And, in order for a plaintiff to prevail on a 42 U.S.C. § 1983

claim, he must prove: (1) he held a constitutionally protected right; (2) he was deprived of this

right in violation of the constitution; (3) the defendants intentionally caused this deprivation; and

(4) the defendants acted under color of State law. *Patrick v. Jasper County*, 901 F.2d 561, 565

8

(7th Cir. 1990).

The "under color of State law" requirement is a part of the prima facie case for a section 1983 claim, and therefore, the plaintiff bears the burden of proof on the issue. *West v. Atkins*, 487 U.S. 42, 48 (1988).  In order to act under color of State law, the defendant must have exercised power "possessed by virtue of State law and made possible only because the wrongdoer is clothed with the authority of State law." *Id.* at 49.  The issue is whether the action taken can be fairly attributable to the State, and thus, a tenuous connection to the State will not convert a private action into one under color of State law. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351-2 (1974).

Mr. Lewellen is not able to show the care provided to him by either Nurse Davis or Nurse Duffield was done under the color of State law.  Mr. Lewellen was brought to Schneck Medical Center, by way of ambulance, immediately after his accident.  There is no evidence which indicates law enforcement directed Mr. Lewellen's transportation to Schneck Medical Center. Likewise, the record does not demonstrate Mr. Lewellen lacked the capability to either refuse medical treatment or elect to be transported to a facility other than Schneck Medical Center. Moreover, according to Mr. Lewellen's own admissions, on June 8, 2003, he did not receive his Miranda warning and notification of his arrest until the time of his discharge from Schneck Medical Center. *Deposition of Kevin Lewellen*, 69:7-70:1, 125:23-126:2.  Thus, he was not detained by law enforcement until after he was released from Schneck Medical Center.  Further, Mr. Lewellen was released on his own recognizance prior to his voluntary return to Schneck Medical Center on June 9, 2003.

In providing care to Mr. Lewellen, Nurse Davis and Nurse Duffield certainly did not exercise power possessed by them by virtue of State law and made possible only because they

were clothed with the authority of State law.  Any attempt to attribute their actions to the State simply on the basis of their employment by Schneck Medical Center is feeble.  If such a proposition were permitted, then any and every other patient dissatisfied with the treatment provided by either Nurse Davis or Nurse Duffield regardless of the circumstances could bring a section 1983 claim against them.  This does not stand to reason.  Therefore, Nurse Davis and Nurse Duffield are entitled to summary judgment on Plaintiffs' 42 U.S.C. § 1983 claims.

      2.     <u>Neither Nurse Davis nor Nurse Duffield acted with "Deliberate Indifference" to Mr. Lewellen's Serious Medical Needs.</u>

During their involvement in Mr. Lewellen's treatment, Nurse Davis and Nurse Duffield were not state actors.  Presuming for a moment they were, however, the evidence does not show they acted with deliberate indifference to Mr. Lewellen's serious medical needs.

A state has an affirmative obligation under the Eight Amendment of the United States Constitution to provide persons in its custody with a medical care system that meets minimal standards of adequacy. *Meriwether v. Faulkner*, 821 F2d 408, 411 (7th Cir. 1987), *cert. denied*, 108 S.Ct. 311 (1987).  However, not every claim by a prisoner alleging inadequate medical care states a constitutional violation. *Id.*  The Supreme Court has limited recover under the Eight Amendment to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "[T]he infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense…Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough." *Shockly v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987).  Further, deliberate indifference entails more than "mere negligence." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001).

"Deliberate indifference exists only when an official knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (construing *Estelle*). A condition is serious if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (citation and internal quotations omitted). Inadvertent failure to provide medical care or negligence in treatment does not constitute cruel and unusual punishment, *Estelle*, 429 U.S. at 105-06, and "the Eighth Amendment is not a vehicle for bringing claims for medical malpractice." *Snipes v. De Tella*, 95 F.3d 586, 590 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997). Further, lack of due care by a government official does not support the sort of abusive conduct that the Due Process clause was designed to prevent. *Davidson v. Cannon*, 106 S.Ct. 670 (1986).

A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005). To satisfy the objective component, a prisoner must demonstrate his medical condition is "objectively, sufficient serious." *Id.* quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* citing *Foelker v. Outagamie County*, 394 F.3d 510 (7th Cir. 2005). "To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a 'sufficiently culpable state of mind.'" *Id.* quoting *Farmer*, 511 U.S. at 834. The prison officials must know of and disregard an "excessive risk to the inmate's health; indeed, they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also

11

draw the inference.'" *Id.* In order to prevail on a claim of deliberate indifference against Nurse

Davis or Nurse Duffield, Plaintiffs must demonstrate they either had "actual knowledge of the

danger, or the danger was objectively so great that actual knowledge of the danger could be

inferred." *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985), *cert. denied*, 479 U.S. 816

(1986). Merely establishing negligence is not enough. *Id.*

 Plaintiffs have failed to demonstrate Nurse Davis or Nurse Duffield had any knowledge

of Mr. Lewellen's serious medical needs. There has been no showing either Nurse Davis or

Nurse Duffield saw Mr. Lewellen's radiology studies, which are the crux of Plaintiffs' claims.

And, certainly, there has been no showing they were responsible for interpreting Mr. Lewellen's

x-ray films and diagnosing his condition. Further, as established by the record, Nurse Duffield's

only involvement in Mr. Lewellen's care was upon his return to Schneck Medical Center from the

Jackson County jail on June 9, 2003, at which time she simply took his vital signs and reported

his prior treatment and chief complaint.

 Without a showing of actual knowledge, the evidence must show "a substantial departure

from accepted professional judgment, practice or standards as to demonstrate that the person

responsible did not base the decision on such a judgment." *Estate of Cole v. Fromm*, 94 F.3d

254, 22 (7th Cir. 1996). Plaintiffs can provide no evidentiary basis on which a reasonable jury

could conclude either Nurse Davis' or Nurse Duffield's conduct demonstrated a substantial

departure from accepted professional judgment. The duties of a nurse are to follow physician

orders and advise the physician of any change in a patient's condition. Here, Nurse Davis and

Nurse Duffield did just that, i.e., advised the physicians treating Mr. Lewellen of any change in

his condition and carried out the orders given to them. In addition, if the Court assumes for

purposes of this Memorandum "Sandra" (as noted in the Jackson County jail records) is Nurse

Duffield, then good nursing care is even further demonstrated by "Sandra" when she informed

the Jackson County jail staff to bring Mr. Lewellen back to the emergency room upon her being

advised of his continued complaints of pain.  Moreover, "Sandra" requested another emergency

room physician review Mr. Lewellen's radiology studies and reported those findings, herself, to

the jail staff.

To support a claim for deliberate indifference, Mr. Lewellen must show Nurse Davis' or

Nurse Duffield's personal involvement, participation, or direct responsibility for the conditions of

which he complains by demonstrating a causal link between Nurse Davis' or Nurse Duffield's

conduct and his injury.  *Starzenski v. City of Elkhart*, 87 F.3d 872 (7th Cir. 1996).  Plaintiffs,

however, can not show any causal link between Nurse Davis' and Nurse Duffield's involvement

in Mr. Lewellen's care and any injury suffered by Mr. Lewellen.  It is the duty of Nurse Davis and

Nurse Duffield to follow physician orders and advise physicians of changes in Mr. Lewellen's

condition, which they appropriately did.  They do not order radiology studies, interpret x-ray

films, make diagnosis, or otherwise determine a patient's course of treatment.

The totality of the evidence presented forthwith reveals Nurse Davis and Nurse Duffield

were in no way deliberately indifferent to the serious medical needs of Mr. Lewellen because

Nurse Davis and Nurse Duffield did not have actual or imputed knowledge of Mr. Lewellen's

fractured vertebra.  Additionally, the evidentiary record negates the presence of the subjective

state of mind required to show deliberate indifference, i.e., Plaintiffs have not demonstrated

either Nurse Davis or Nurse Duffield was subjectively aware of Mr. Lewellen's serious medical

needs and one or both disregarded those needs.  There exists no material issue of trial fact, and

Nurse Davis and Nurse Duffield are entitled to summary judgment as a matter of law on

Plaintiffs' 42 U.S.C. § 1983 claims.

C.    Schneck Medical Center Did Not Violate the Screening or Stabilizing Treatment
      Requirements of the Emergency Medical Treatment and Labor Act ("EMTALA").

Congress enacted in response to the growing concern about the provision of medical

services in hospital emergency departments to individuals who are indigent and uninsured.

Congress was concerned hospitals were "dumping" patients who were unable to pay for care,

either by refusing to provide emergency treatment to those individuals or by simply transferring

those patients to other hospitals before the patient's condition was stabilized.  *H.R. Rep. No. 241*,

99th Cong., 1st Sess., Part I at 27 (1985), *reprinted in* 1986 U.S. Code Cong. & Admin. News,

579, 605.  Although prompted by concern for the availability of emergency medical care for the

poor, the provisions of EMTALA, as enacted, protect all individuals, not just those who are

uninsured or indigent.  *Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002).

Cases which have analyzed EMTALA appear to conclude EMTALA imposes two duties,

typically referred to as the "Screening Requirement" and the "Stabilization Requirement."

*Magruder ex rel. Magruder v. Jasper County Hosp.*, 243 F.Supp.2d 886, 890 (N.D. Ind. 2003)

(citing *Hicklin v. WBH Evansville, Inc.*, 2001 WL 1768422 (S.D. Ind. 2001)).

By its terms, EMTALA imposes a series of obligations on hospital emergency

departments; including, first, a duty the hospital must provide an "appropriate medical screening

examination within the capability of the hospital's emergency department."  42 U.S.C.

§ 1395dd(a).  This examination is intended to determine "whether or not an emergency medical

condition ... exists."  *Id.*  An "emergency medical condition" is defined as a condition

"manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the

absence of immediate medical attention could reasonably be expected to result in – (i) the placing

of the health of the individual ... in serious jeopardy, (ii) serious impairment to bodily functions,

14

or (iii) serious dysfunction of any bodily organ or part ..." *Id.*, § 1395dd(e)(1)(A).

Second, in the event the hospital detects the presence of an emergency medical condition, the hospital must provide "either (A) within the staff and facilities available at the hospital, for such medical examination and such treatment as may be required to stabilize the medical condition, or (B) for the transfer of the individual to another medical facility ..." *Id.*, § 1395dd(b)(1).

If a patient presenting to the emergency department at a hospital is determined to have an "emergency medical condition" which has not been stabilized, "the hospital may not transfer the individual unless ... a physician has signed a certification that, based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual ..." 42 U.S.C. § 1395dd(c)(1). The text of the statute makes clear that the hospital's duty to stabilize a patient does not arise until the hospital first detects an emergency medical condition. *Magruder*, 243 F.Supp.2d at 894 (citing *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 (9th Cir. 1995)).

    1.    <u>Schneck Medical Center provided Kevin Lewellen an appropriate medical screening within the requirements of EMTALA.</u>

Again, during the course of discovery in this case, Plaintiffs were asked in interrogatories to state each claimed violation of EMTALA upon which their Complaint is based. In response, Plaintiffs stated,

> Plaintiff [Kevin Lewellen] presented to Schneck's emergency department complaining of sever back pain and intoxicated. Because Plaintiff was intoxicated (Schneck's blood test of Plaintiff purports to show a blood alcohol concentration of .297%), Schneck's emergency department staff provided Plaintiff with only a cursory examination, including discharging Plaintiff in the fact of Plaintiff's complaints of sever back pain and x-rays that the emergency physician deemed

non-diagnostic. Schneck also failed to stabilize Plaintiff before discharging him. Schneck's own lab work revealed that Plaintiff's blood alcohol level was dangerously high, rendering him unstable in and of itself. That instability was exacerbated by the fact that Plaintiff was experiencing and verbalizing sever back pain that prevented him from even raising himself off of the examination table.

*Plaintiffs' Answers to Defendants' First Interrogatories*, No. 11.

Plaintiffs do not dispute the fact Kevin Lewellen was examined in Schneck Medical Center's emergency department on June 8, 2003. Mr. Lewellen was clearly not turned away from the emergency department or refused treatment upon entry. Rather, Plaintiffs take issue only with the quality and nature of the examination conducted by Dr. Reisert prior to Mr. Lewellen's discharge. Plaintiffs contend Dr. Reisert's examination was medically inadequate and failed to detect what Plaintiffs contend was an emergency medical condition. Plaintiffs contentions fail to establish a violation of EMTALA. The medical screening provided by Schneck Medical Center to Mr. Lewellen on June 8, 2003 fully satisfied the requirements of EMTALA.

The provisions of EMTALA do not specifically define the content of an "appropriate medical screening," and the Seventh Circuit has not been called upon to address the issue. Several circuits have, however, addressed the content of such an examination. "EMTALA has been universally construed as *not* establishing for hospitals a national standard of care for screening patients in the emergency department." *Magruder*, F.Supp.2d at 891 (italics in original) (citing *Bryant*, 289 F.3d 1162; *Jackson v. East Bay Hospital*, 246 F.3d 1248 (9th Cir. 2001); *Phillips v. Hillcrest Medical Center*, 244 F.3d 790 (10th Cir. 2001); *Summers v. Baptist Medical Center*, 91 F.3d 1132, 1137 (8th Cir. 1996) ("So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms."). As such, an appropriate EMTALA medical screening does not mean a "medically adequate screening." *Jackson*, 246 F.3d at 1255. Instead,

as the Ninth Circuit stated in *Jackson*:

> Seven of our sister circuits have held that to comply with [the medical screening]
> requirement, a hospital only must provide a screening examination that is
> comparable to that offered to other patients with similar symptoms. See *Correa v.*
> *Hosp. San Francisco*, 69 F.3d 1184, 1192-93 (1st Cir. 1995) ("[F]aulty screening,
> in a particular case, as opposed to disparate screening or refusing to screen at all,
> does not contravene the statute."); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872,
> 879 (4th Cir. 1992) ("[W]hile EMTALA requires a hospital emergency
> department to apply its standard screening examination uniformly, it does not
> guarantee that the emergency personnel will correctly diagnose a patient's
> condition as a result of this screening."); *Marshall v. E. Carroll Parish Hosp. Ser.*,
> 134 F. 3d 319, 323-24 (5th Cir. 1998) ("[A]treating physician's failure to
> appreciate the extent of the patient's injury or illness ... may constitute negligence
> or malpractice, but cannot support an EMTALA claim for inappropriate
> screening.... It is the plaintiffs' burden to show that the Hospital treated her
> differently from other patients"); *Cleland v. Bronson Health Care Group, Inc.*,
> 917 F.2d 266, 272 (6th Cir. 1990) ("If [the hospital] acts in the same manner as it
> would have for the usual paying patient, then the screening provided is
> 'appropriate' within the meaning of the statute."); *Summers v. Baptist Med. Ctr.*
> *Arkadelphia*, 91 F.3d 1132, 1139 (8th Cir. 1996) (en banc) ("[W]e hold that
> instances of 'dumping' or improper screening of patients for a discriminatory
> reason, or failure to screen at all, or screening a patient differently from other
> patients perceived to have the same condition, all are actionable under EMTALA.
> But instances of negligence in the screening or diagnostic process, or of mere
> faulty screening, are not."); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.
> 1994) ("As long as a hospital applies the same screening procedures to indigent
> patients which it applies to paying patients, the hospital does not violate this
> section of the Act."); *Gatewood v. Wash. Healthcare Crop.*, 933 F.2d 1037, 1041
> (D.C. Cir. 1991) ("[A] hospital fulfills the 'appropriate medical screening'
> requirement when it conforms in its treatment of a particular patient to its standard
> screening procedures.").
>
> We hold that a hospital satisfies EMTALA's "appropriate medical screening"
> requirement if it provides a patient with an examination comparable to the one
> offered to other patients presenting similar symptoms, unless the examination is
> so cursory that it is not "designed to identify acute and severe symptoms that alert
> the physician of the need for immediate medical attention to prevent serious
> bodily injury." *Eberhardt*, 62 F.3d at 1257. This standard is consistent with
> Congress's purpose in enacting EMTALA, which was to limit the ability of
> hospitals to avoid treating poor or uninsured patients. See 1986 U.S.C.C.A.N. at
> 605.

*Jackson*, 246 F.3d at 1255-56.

Thus, based upon the foregoing authority, the initial issue in determining whether a hospital has complied with the EMTALA screening requirement is whether the hospital provided the patient with an examination comparable to that offered to other patients presenting similar symptoms. In this case, Plaintiffs have not alleged in either their Complaint or in their discovery responses the medical screening examination provided by Dr. Reisert differed from the examination provided to other patients. To the contrary, as reflected in the deposition testimony of Dr. Reisert, Mr. Lewellen received a medical screening on June 8, 2003 which was comparable to that offered to similar patients. More specifically, upon arriving at the Schneck Medical Center emergency department on June 8, 2003, Mr. Lewellen was seen, assessed and triaged by the members of the nursing staff and was further seen and examined by Dr. Reisert, the emergency department physician on duty. *Schneck Medical Center's Records*. Dr. Reisert conducted a physical examination of Mr. Lewellen, which in Dr. Reisert's assessment, concluded Mr. Lewellen had a normal neurological examination. *Deposition of Dr. Reisert, D.O.*, 71:16-72:14, 136:9-137:17, 157:9-158:12. As Dr. Alexander has testified, Dr. Reisert's medical examination of Mr. Lewellen was an accepted method of treating him and comparable to that offered to other patients presenting similar symptoms. *Deposition of John Alexander, M.D.*, 40:9-41:25, taken July 13, 2006, attached to Defendants' Designation of Evidence as Exhibit C. On these undisputed facts, it simply cannot be seriously contended Mr. Lewellen did not receive an appropriate medical screening as required under EMTALA as that requirement has been interpreted by the federal courts.

It is anticipated Plaintiffs will contend in opposition to Defendants' motion for summary judgment the medical screening examination provided to Mr. Lewellen was substandard and was, therefore, not "designed to identify acute and severe symptoms." *Jackson*, 246 F.3d at 1256.

18

The deposition testimony of Dr. Reisert, however, completely refutes any such allegation. It is undisputed Dr. Reisert examined Mr. Lewellen and found he had a normal neurological examination. Based upon his examination, Dr. Reisert brought to bear on the case his medical judgment and concluded Mr. Lewellen could be safely discharged. Although Schneck Medical Center fully supports Dr. Reisert in his clinical judgment, if Dr. Reisert was wrong in his treatment or diagnosis, it was simply that Dr. Reisert failed to appreciate the seriousness of Mr. Lewellen's medical condition. If that is the case, this matter is properly left for determination in the state law medical malpractice action which Plaintiffs have filed against these same defendants before the Indiana Department of Insurance. It does not, in any respect, establish at all their claim of a violation of EMTALA in this Court. *Marshall v. E. Carroll Parish Hosp. Serv.*, 134 F.3d 319, 323-24 (5th Cir. 1998).

Based upon the foregoing, there is no genuine issue of material fact regarding the Schneck Medical Center's compliance with EMTALA, and Schneck Medical Center is entitled to judgment as a matter of law. The Court, therefore, should grant Schneck Medical Center's Motion for Summary Judgment, finding in favor of Schneck Medical Center on Plaintiffs' violation of EMTALA claim.

     2.    <u>Schneck Medical Center did not violate EMTALA's stabilization requirements in discharging Kevin Lewellen from the emergency department.</u>

Plaintiffs also assert Schneck Medical Center failed to stabilize Mr. Lewellen's emergency medical condition prior to his discharge in violation of 42 U.S.C. § 1395dd(b)(1). As noted above, however, no court which has addressed the provisions of EMTALA has ruled the statute provides a federal cause of action for medical malpractice. Even accepting Plaintiffs' allegation regarding stabilization, it is clearly without merit. Again, as the court stated in

*Jackson*:

> As we have previously explained, a "hospital's duty to stabilize the patient does
> not arise until the hospital first detects an emergency medical condition."
> *Eberhardt*, 62 F.3d at 1259. In *Eberhardt*, the plaintiff claimed that the hospital
> violated EMTALA's stabilization requirements by failing to treat his son's suicidal
> tendency, and that this failure led to his son's death. We rejected this argument,
> and held that the hospital had no obligation to stabilize the son's suicidal
> tendency, because the hospital never detected it. *Id.* This "actual detection" rule
> comports with the law of five other circuits, which requires a showing of actual
> knowledge of the emergency medical condition by the hospital as a condition
> precedent to the stabilization requirement. *See Summers*, 91 F.3d at 1140 (8th
> Cir.). ("[U]nder the express wording of the statute, this portion of EMTALA
> applies only if 'the hospital determines that the individual has an emergency
> medical condition...' Here, the hospital believed [the patient] was suffering from
> muscle spasms, not an emergency medical condition. The duty to stabilize
> therefore never arose.") (citing *Vickers v. Nash Gen. Hosp. Inc.*, 78 F.3d 139, 140
> (4th Cir. 1996); *Urban v. King*, 43 F.3d 523, 525-26 (10th Cir. 1994); *Cleland*,
> 917 F.2d at 268-69 (6th Cir.)); *Gatewood*, 933 F.2d at 1041 (D.C. Cir.) ("Here, no
> such [emergency] condition was diagnosed, and the statute's stabilization and
> transfer requirements are therefore inapplicable.").

*Jackson*, 246 F.3d 256-57.

In the present case, even a cursory review of Dr. Reisert's testimony clearly demonstrates

he conscientiously considered Mr. Lewellen's condition, determined Mr. Lewellen had a normal

neurological examination and ruled out the need for additional treatment. *Deposition of Dr.

Reisert*, 71:16-72:14, 136:9-137:17, 157:9-158:12, 204:12-205:5. Thus, under the "actual

detection" rule, Schneck Medical Center's duty to stabilize Mr. Lewellen pursuant to EMTALA

never arose, since Mr. Lewellen was never diagnosed as having an emergency medical condition.

The facts and issues of the present case are akin to those presented in the case of *Bryant v.

Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002). In *Bryant*, a minor was brought to

the defendant-hospital's emergency department with a history of fever and "coughing up blood."

289 F.2d at 1164. The minor was examined by the nursing staff and was triaged. *Id*. The patient

was subsequently seen by a physician. *Id*. The patient's mother reported to the physician the

patient had a fever for about four days and appeared to have pain on the right side of the chest. *Id.*

The physician examined the patient and ordered a chest x-ray and blood tests.  In examining the chest x-ray, the physician failed to note a large lung abscess which was conceded by the defendant-hospital to constitute an emergency medical condition.  *Id.*  The emergency room physician diagnosed the patient with only pneumonia and asthma and prescribed medication.  *Id.*  Since the patient's condition appeared to the physician to be stable, the physician discharged the patient to home with instructions he should be brought back to the hospital the following day for further diagnosis and treatment.  *Id.*

The following day, when the patient was preparing to return to the hospital, an employee of the hospital called and told the family that another physician who had reviewed the x-ray had diagnosed the lung abscess.  *Id.*  The family was instructed to return to the hospital immediately.  *Id.*  The patient was ultimately admitted to the hospital.  *Id.*  The patient was subsequently discharged from the hospital but later died.  *Id.*

The family brought suit against the hospital alleging a violation of EMTALA.  The plaintiff alleged when the patient sought care from the hospital's emergency department, the emergency department staff failed to detect his emergency medical condition and then discharged him to home without stabilizing his condition as required by EMTALA.  *Id.* at 1163.  The district court granted the hospital's motion for summary judgment on the holding the hospital could not be liable under EMTALA merely because its medical staff failed to detect an emergency medical condition.  *Id.*  The plaintiff appealed.

As in the present case, in *Bryant*, there was no dispute the patient had been seen and examined in the hospital's emergency department.  *Id.* at 1165-66.  The plaintiff, however,

argued, in effect, that the hospital should be held liable under EMTALA, because its staff

negligently failed to detect the patient's emergency medical condition. *Id.* at 1166. The Ninth

Circuit rejected this argument and affirmed the district court's grant of summary judgment,

holding:

> EMTALA, however, was not enacted to establish a federal medical malpractice
> cause of action nor to establish a national standard of care. ... Thus, we have
> held that a hospital has a duty to stabilize only those emergency medical
> conditions that its staff detects. ... Every circuit to address this issue is in accord.
> ... To restate our ruling in *Jackson*, we hold that a hospital does not violate
> EMTALA if it fails to detect or if it misdiagnoses an emergency condition.

*Bryant*, 289 F.3d at 1166 (citations omitted) (footnote omitted).

As in *Bryant*, Plaintiffs in the present action do not contend Dr. Reisert or the Schneck

Medical Center emergency department nursing staff intentionally failed to diagnose an

emergency medical condition. *Id.* at 1166 n. 3. Indeed, Dr. Reisert's deposition testimony

completely belies any such allegation. *Deposition of Dr. Reisert*, 71:16-72:14, 136:9-137:17,

157:9-158:12. Thus, the medical screening examination afforded to Mr. Lewellen was clearly

sufficient to identify acute and severe symptoms which would alert Dr. Reisert of the need for

immediate medical attention to prevent serious bodily injury. *Bryant*, 289 F.3d at 1166 n. 3. If

Plaintiffs are entitled to a remedy at all as a result of the events of June 8, 2003, that remedy must

be sought in their medical malpractice action currently pending before the Indiana Department of

Insurance. There exists no remedy in the present case under EMTALA, the Court should grant

Schneck Medical Center's Motion for Summary Judgment, finding in favor of Schneck Medical

Center on Plaintiffs' violation of EMTALA claim.

D.    Plaintiffs' Recovery of Damages Under EMTALA is Capped by the Indiana Medical
      Malpractice Act.

If it is ultimately determined Schneck Medical Center committed an EMTALA violation

and Plaintiffs are entitled to an award, then the amount of Plaintiffs' award is capped by the limitations imposed by the Indiana Medical Malpractice Act. *Ind. Code Ann.* § 34-18-1-1 et seq. (West 1999). More specifically, the Court should find, as a matter of law, the total amount recoverable by Plaintiffs on their EMTALA claim may not exceed one million two hundred fifty thousand dollars ($1,250,000); of which Defendants are not liable for an amount in excess of two hundred fifty thousand dollars ($250,000). *Id.* § 34-18-14-3.

In determining whether a malpractice damages cap applies to an EMTALA claim in a particular state, the state's definition of malpractice and how the state's courts have applied that definition is examined by the federal and state courts. *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 860 (4th Cir.1994); *Jackson v. East Bay Hosp.*, 980 F.Supp. 1341, 1348-49 (N.D. Cal.1997); *Barris v. County of Los Angeles*, 972 P.2d 966, 974 (Cal. 1999). In Indiana, malpractice is defined as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." *Ind. Code Ann.* § 34-18-2-18 (West 1999). Further, tort is defined as a "legal wrong, breach of duty, or negligent or unlawful act or omission proximately causing injury or damage to another," *Id.* § 34-18-2-28, and health care is an "act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement." *Id.* § 34-18-2-13. Together, these definitions encompass a wide array of conduct; however, all claims involving patients and health care providers are not governed by Indiana's malpractice act.

The courts of Indiana look to the substance of a claim, rather than its caption or theory of liability, to determine if the state's malpractice act applies. Generally, Indiana's courts apply the act when the claim involves conduct which is "curative or salutary in nature," *Van Sice v.*

23

*Sentany*, 595 N.E.2d 264, 266 (Ind.Ct.App. 1992), and typically refrain from applying it in

instances where the conduct is "unrelated to the promotion of a patient's health or the provider's

exercise of professional expertise, skill or judgment." *Collins v. Thakkar*, 552 N.E.2d 507, 510

(Ind.Ct.App. 1990).

These guidelines have defined the boundaries of the Indiana Medical Malpractice Act.

On the one hand, the Indiana Court of Appeals has held being struck by a falling surgical lamp,

contracting an illness while a patient, or being sexually assaulted by a hospital counselor need not

involve medical malpractice. *Pluard v. Patients Compensation Fund*, 705 N.E.2d 1035, 741-42

(Ind.Ct.App. 1999) (holding the improper installation of a surgical lamp was not a health care

issue involving the exercise of professional skill or judgment); *Methodist Hosp. of Ind., Inc. v.

Ray*, 551 N.E.2d 463, 466 (Ind.Ct.App. 1990) (determining an infestation of Legionnaire's

Pneumonia virus, resulting in a patient's illness, was not a situation unique to hospitals); *Doe v.

Madison Ctr. Hosp.*, 652 N.E.2d 101, 104-5 (Ind.Ct.App. 1995) (finding an alleged sexual

assault by a counselor was unrelated to the patient's health and the claim "cannot be recast to

speak in the language of medical malpractice").  On the other hand, Indiana's courts have upheld

the application of the act when the alleged negligent conduct or injury is strongly connected to

the health care setting.  The failure to obtain informed consent, a doctor's alleged fraudulent

representations about an operation's risks, and a hospital's failure to provide adequate security of

a patient are all conduct which is subject to the malpractice act. *Van Sice*, 595 N.E.2d at 267

(holding a battery claim based on a physician's alleged failure to obtain informed consent

involved the rendition of professional services); *Keuster v. Inman*, 758 N.E.2d 96, 102

(Ind.Ct.App. 2001) (finding proof of fraudulent statements by physician would be the essence of

a medical malpractice case); *Ogle v. St. John's Hickey Mem'l Hosp.*, 473 N.E.2d 1055, 1059

(Ind.Ct.App. 1985) (determining the malpractice act governed an alleged failure to protect a psychiatric patient from sexual assault because her confinement was integral to the diagnosis and treatment of her condition). "[T]he question of whether a particular claim falls within the Act is extremely fact sensitive...." *Winona Mem'l Found. of Indianapolis v. Lomax*, 465 N.E.2d 731, 740 n. 1 (Ind.Ct.App. 1984).

In this case, Plaintiffs have alleged EMTALA violations which are intricately tied to the provision of health care or lack thereof. They maintain the examination Schneck Medical Center provided to Mr. Lewellen was "not an appropriate medical screening medical examination within the meaning of 42 U.S.C. § 1395dd(a)." *Compl.*, ¶ 52. Plaintiffs' allegations, that Schneck Medical Center did not provide Mr. Lewellen an appropriate medical screening, cannot be divorced from the health care setting. For example, Plaintiffs have not alleged Schneck Medical Center had a business policy or practice of turning away intoxicated patients, a form of discriminatory conduct that could be characterized as neither salutary nor curative, nor unique to hospitals. As Plaintiffs have acknowledged in their Complaint, Mr. Lewellen was seen by the staff of Schneck Medical Center's emergency department. A physician performed a physical examine and radiology and laboratory studies were completed. *Compl.* ¶¶ 18-21.

In an EMTALA screening claim, the issue is whether the hospital uniformly provides "a screening examination reasonably calculated to identify critical medical conditions." *Magruder*, 243 F.Supp.2d at 890. At a minimum, Plaintiffs must show Mr. Lewellen did not receive such care. Such proof falls squarely within the definition of malpractice in Indiana, i.e., an injury stemming from health care that should have been provided.

Plaintiffs other contentions allege Schneck Medical Center "failed to stabilize Mr. Lewellen's emergency medical condition before it discharged him." *Compl.*, ¶ 58. Stabilization

also relates directly to the provision of health care, as it is the treatment needed to prevent "the threatening and severe consequences" of the patient's emergency medical condition. *Barris*, 972 P.2d at 972 (quoting *Burditt v. U.S. Dep't of Health & Human Servs.*, 834 F.2d 1362, 1369 (5th Cir. 1991). In substance, Plaintiffs' allegation of a failure to stabilize Mr. Lewellen depends on the health care Schneck Medical Center provided or should have provided to Mr. Lewellen. All in all, Plaintiffs' EMTALA claims allege the sort of conduct Indiana courts have consistently found to be subject to the Indiana Medical Malpractice Act. Therefore, the Court should find the Indiana Medical Malpractice Act's limitations on damages apply to Plaintiffs' EMTALA claims.

Should Plaintiffs' EMTALA claims survive summary judgment, be presented to a trier of fact, and ultimately result in an award; then said award, as a matter of law, should be capped by the limitations imposed by the Indiana Medical Malpractice Act. Accordingly, the Court should grant Schneck Medical Center's Motion for Summary Judgment and find any recovery by Plaintiffs on their EMTALA claims may not exceed one million two hundred fifty thousand dollars ($1,250,000); of which Defendants are not liable for an amount in excess of two hundred fifty thousand dollars ($250,000).

## CONCLUSION

Neither Defendant A. Davis, R.N., nor Defendant Sharon Duffield, R.N., acted with deliberate indifference to Plaintiff Kevin Lewellen's serious medical needs. Further, Defendant Schneck Medical Center did not violate the screening or stabilizing treatment requirements of EMTALA. As such, and for the above stated reasons, it is respectfully requested summary judgment be entered in favor of Defendants, Schneck Medical Center a/k/a Schneck Memorial Hospital, A. Davis, R.N., and Sharon Duffield, R.N., and against Plaintiffs, Kevin Lewellen and Janet Lewellen, on all Plaintiffs' claims.

Further, in the event it is determined Plaintiffs' EMTALA claim survives, then the Court should hold any amounts which may be awarded Plaintiffs on this basis are capped by the limitations set forth by the Indiana Medical Malpractice Act.  Therefore, alternatively, Defendant Schneck Medical Center respectfully requests partial summary judgment be entered in its favor and against Plaintiffs on the issue of recoverable EMTALA damages.

Respectfully submitted,

s/ Kirk R. Jocham
Kirk R. Jocham (#23018-06)
HALL RENDER KILLIAN HEATH & LYMAN, P.C.
Suite 2000, Box 82064
One American Square
Indianapolis, IN 46282
(317) 633-4884
(317) 633-4888 (FAX)
E-mail: kjocham@hallrender.com
*Attorney for Defendants, Schneck Medical Center a/k/a
Schneck Memorial Hospital, A. Davis, R.N. and Sharon
Duffield, R.N.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2007, a copy of the foregoing *Memorandum in Support* was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system:

Christopher C. Hagenow
Hopper Blackwell Ramsey Burhmeier, P.C.
Bank One Center/Circle
111 Monument Circle, Suite 452
Indianapolis, Indiana 46204
chagenow@hopperblackwell.com

Edward J. Liptak
CARSON BOXBERGER
3100 John Hinkle Place
Suite 106
Bloomington, IN 47401
ejl@carsonboxberger.com

Gary J. Clendening
Anthony J. Yorio, Jr.
MALLOR CLENDENING GRODNER
    & BOHRER
511 Woodscrest Drive
P O Box 5787
Bloomington, IN 47407-5787
gjclende@mcgb.com
ayorio@mcgb.com

W. David Bridgers
Kristen V. Dyer
Philip N. Elbert
NEAL & HARWELL, PLC
One Nashville Place, Suite 2000
150 Fourth Avenue, North
Nashville, TN 37219
dbridgers@nealharwell.com
kdyer@nealharwell.com
pelbert@nealharwell.com

*s/ Kirk R. Jocham*
Kirk R. Jocham
HALL RENDER KILLIAN HEATH & LYMAN, P.C.
E-mail: kjocham@hallrender.com

#547482