UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| KEVIN LEWELLEN and JANET LEWELLEN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 4:05-cv-0083-JDT-WGH |
| SCHNECK MEDICAL CENTER a/k/a SCHNECK MEMORIAL HOSPITAL, A. DAVIS, R.N., JOHN M. REISERT, M.D., JOHN F. ALEXANDER, M.D., and SHARON DUFFIELD, R.N., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Doc. Nos. 45, 54 & 88)[1]**

        While driving drunk through Jackson County, Indiana, Plaintiff Kevin Lewellen ran

off the interstate and suffered a burst fracture in his lower back.  He was taken to

Defendant Schneck Memorial Hospital ("Schneck") but was discharged without the burst

fracture being diagnosed.  He was then taken immediately to jail for operating a vehicle

while intoxicated.  Over the course of his stay in jail, his fracture caused permanent

damage.

        This matter comes before the court on Defendants' motions for summary

judgment.  (Doc. Nos. 45, 54 & 88.)  Plaintiff sues Defendant health care providers

under 42 U.S.C. § 1983 and the Emergency Medical Treatment and Labor Act, 42

_____

        [1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

U.S.C. § 1395dd ("EMTALA").[2]  Plaintiff argues that two doctors and two nurses at Schneck violated his Fourteenth Amendment rights to adequate medical care as a pretrial detainee.  He also argues that defendant hospital violated EMTALA's screening and stabilization requirements.  Defendants Dr. Reisert and Dr. Alexander filed separate motions for summary judgment, followed by a motion for summary judgment from Schneck with Nurses Davis and Duffield.  All three motions are ripe and the court rules as follows:

---

[2]  Mr. Lewellen's wife, Janet, is also named as a Plaintiff in this case.  The Lewellens' complaint contains a cause of action for Janet Lewellen's loss of consortium through EMTALA. This claim was not addressed in the parties' briefs and so survives summary judgment. However, for the sake of clarity, and because only Mr. Lewellen's claims are discussed in the briefs on this motion, throughout this Entry the court will refer to Plaintiff in the singular.

**Table of Contents**

I.   Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.  Facts for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

III. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

     A.   42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

          1.   State Action and Under Color of State Law

               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

          2.   Custody . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

          3.   Deliberate Indifference . . . . . . . . . . . . . . . . . . . -23-

     B.   EMTALA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

          1.   Substance of the EMTALA Claim . . . . . . . . . . . . -34-

          2.   Medical Malpractice Act . . . . . . . . . . . . . . . . . . . -37-

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-

## I.  Summary Judgment Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).  In order to survive a motion for summary judgment, a party must "set forth facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

## II.  Facts for Summary Judgment

Plaintiff Kevin Lewellen is a registered nurse anesthetist in Paris, Tennessee, who made a terrible mistake on June 8, 2003.  After a weekend visit with his cousin in Greenwood, Indiana, Lewellen began the roughly 350 mile journey home with a drink of scotch.  He stopped between Greenwood and Interstate 65 to open his trunk and pour another glass of scotch and drink it; then he continued on his way.  Whether these were his only drinks that morning or not, three hours later his blood alcohol content would be nearly four times the legal limit and he would be heading to the hospital, afterwards to jail.

Lewellen's bad judgment caught up with him somewhere in Jackson County, Indiana, near Seymour.  While traveling on Interstate 65, his vehicle left the road, rolled once, and ended up in a ditch fifty to one hundred yards from the highway.[3]  The accident involved only Lewellen's car, which was badly damaged.  Lewellen was also injured in the accident.

When Troopers Roger Drew and Rick Hudson of the Indiana State Police arrived at the accident site, paramedics were already there placing Lewellen on a stretcher and loading him into an ambulance.  Lewellen was, according to Drew, clearly intoxicated. The Troopers had the EMTs draw blood from Lewellen to test his blood alcohol level.[4] According to the probable cause determination filed the next day in Jackson County Superior Court, the time of arrest was 2:22 pm.  But because Lewellen had been in an accident and was complaining of lower back pain, the EMTs transported him to Schneck Memorial Hospital ("Schneck"),[5] a county-owned hospital.  Troopers Drew and Hudson completed some work at the accident site and then proceeded to Schneck to await Lewellen's release.

---

[3]  Exactly what circumstances led to the crash—other than Lewellen's intoxication—are cloudy; Lewellen remembers little.  The police report indicates that Lewellen was traveling northbound (i.e., in the opposite direction of his destination).  Lewellen believes he was traveling southbound.  Lewellen claimed at the time of the accident that he had fallen asleep at the wheel, but now admits that he missed an exit ramp and may have misled the police at the scene out of fear.  At any rate, these facts are not relevant to the outcome of this motion.

[4]  The record does not indicate whether Lewellen consented to the blood being taken or not.

[5]  The hospital is now know as Schneck Medical Center.

Piecing together what transpired at the hospital is complicated by the fact that Lewellen's recollection is understandably hazy and all of the personnel at Schneck deny any memory of the incident.  But a basic narrative can be cobbled together from the hospital records, from Lewellen's patchy recollections, and from the State Troopers, who in contrast to the health care providers, do remember the events of June 8, 2003.

According to hospital records, Defendant Amanda Davis, a nurse in the Emergency Department, admitted Lewellen to the hospital shortly after 3:00 p.m.  She did an initial assessment and noted on Lewellen's chart that he had been in a motor vehicle accident.  After this initial assessment, Defendant John M. Reisert, a doctor on duty, examined Lewellen.  Reisert noted that Lewellen was complaining of lower back pain and his lumbar spine was tender.  Reisert ordered x-rays of Lewellen's lumbar and cervical spine to determine whether Lewellen had fractured his back in the accident.

Lewellen was then taken to the x-ray room.  Construing the facts most favorably to Lewellen,[6] several x-rays were taken of Lewellen while he was flat on his back with no trouble.   However, when the technicians tried to turn Lewellen on his side to get a different view, Lewellen remembers being in significant pain.  Somewhere in the process Dr. Reisert modified his order to eliminate several of these views requiring

---

[6]  The accounts of what transpired in the x-ray room vary.  Although no one but Lewellen remembers the events, the hospital records blame the poor quality of the x-rays on Lewellen's abusive and uncooperative behavior.  Lewellen contends that to the extent he was uncooperative it was due to the tremendous amount of pain he was in as the x-ray technicians attempted to turn him.  Trooper Drew backs Lewellen's version by stating that Lewellen was nothing but cooperative when he observed him.  In any case, the facts must be construed in Lewellen's favor.

Lewellen to be turned on his side.  One technician noted in Lewellen's records that he was "uncooperative [and] made threats to staff."  (Pls.' Ex. 10, at 010.)  The final x-ray was a lateral view (essentially a side view) of his lumbar spine, requiring Lewellen to be rolled on his side ninety degrees.

At 3:51 p.m., the lab report on Lewellen's blood alcohol test revealed that he had a blood alcohol level of .297.  Before the last of Lewellen's x-rays had even printed, at 4:07 p.m., Davis informed Lewellen that Reisert was discharging him.  This was less than one hour after Lewellen had been admitted to the hospital.  Lewellen refused to sign the consent to discharge, pleaded with Davis that he was in tremendous pain and begged to talk to the doctor.  Nurse Davis told Trooper Drew, who was at the hospital waiting for Lewellen with Trooper Hudson, that Lewellen was not cooperating in the discharge and asked if Drew would sign the discharge.  Drew refused.

Drew then went to Lewellen and explained what the investigation had revealed and that Lewellen would have to go to the county jail.  Drew claims that Lewellen was not combative or uncooperative, but Lewellen was insistent that he was in great pain and that the hospital had not examined him sufficiently.  Drew asked Nurse Davis about Lewellen's pain and asked if the hospital was really done examining him.  Nurse Davis responded that Lewellen was fine, he was just drunk.

However, Lewellen was in too much pain to stand or walk.  Drew got Trooper Hudson to help him put Lewellen in a wheelchair that nurse Davis was holding steady.  Lewellen could not even sit properly in the wheelchair.  According to Drew, Lewellen

-4-

assured Drew that "I'm not upset with you, I'm in pain.  Something is wrong and I can't stand up."  (Drew Aff. ¶ 8.)  Throughout this process, Lewellen continued to plead with the officers and Nurse Davis that he was in pain and that something was wrong.  Drew explained to Lewellen that once the hospital had discharged him he had no choice but to transport Lewellen to jail.

At 4:10 p.m., three minutes after Nurse Davis attempted to get Lewellen to sign his discharge papers, Lewellen was discharged from the hospital.  At exactly the same time, according to hospital records, the last of Lewellen's x-rays came off the printer.  Lewellen contends that Dr. Reisert did not even bother to look at these x-rays before deciding to discharge him.  And given the fact that some of the x-rays were not printed until after Lewellen was informed he was being discharged, this fact can be construed in his favor.  At some point, whether before or after Lewellen was discharged, Reisert wrote on the ER chart that the x-rays revealed no fracture and that Lewellen's lack of cooperation caused the films to be of poor quality.

Because of the amount of pain that Lewellen was in, Troopers Drew and Hudson varied from normal practice and handcuffed Lewellen in the front rather than the back as they transported him to jail.  Officer McPherson was working in the Jackson County Jail that afternoon and observed Lewellen screaming out in pain as he was led through the booking process.  Throughout, Lewellen asked to be taken back to Schneck for medical treatment.  But Lewellen was placed in a cell at the Jackson County Jail.

At 6:15 p.m., two hours after being discharged from the hospital, Defendant Dr. John F. Alexander, a radiologist at Schneck, looked at Lewellen's x-rays as part of a second read quality control process.  His report mentions the poor quality of the x-rays and blames Lewellen's lack of cooperation, but Alexander admitted in his deposition that he had no reason to believe that that was the case.  The report also states that Lewellen's spine had an ossific density left of the L1-L2 disc space that could be an osteophyte,[7] but a fracture "cannot be completely excluded" because the lateral view of the lumber spine was not diagnostic, meaning that it was not clear enough to be useful. According to protocol, if the radiologist notices something that the ER physician missed, the radiologist needs to communicate with the ER physician.  From the record, it appears that Alexander contacted no one.

Yet there was something seriously wrong with Lewellen.  He had a burst fracture in his spine that was damaging his spinal nerves while he was being held in the Jackson County Jail.  Over the course of the night, Lewellen started to notice neurological systems like numbness in his lower body.  Despite the fact that Alexander and Reisert claim not to be able to tell if there was a fracture from Lewellen's x-rays, several other doctors who have looked at them say that a fracture can be seen.  These include Alexander's boss, Dr. Staib, who although he could understand how "an optical illusion" could make a radiologist miss the fracture, in his deposition was asked: "if you got that [x-ray] that night before you even looked at the lateral . . . you could tell, couldn't you,

_____

[7] An osteophyte is also called a bone spur.

-6-

Doctor, that it was fractured?"  The doctor responded: "I hope that I would be able to do that."  (Staib Dep. 43.)

Dr. David Schwartz, an orthopedic surgeon at Methodist Hospital in Indianapolis, who later performed surgery on Lewellen, was more blunt.  In an affidavit submitted by Lewellen, Schwartz claims that a burst fracture is clear from the x-rays taken at Schneck on June 8.  He writes: "There is nothing ambiguous about these x-rays.  When you put them on a view box, the fracture at L-2 is immediately apparent on both the AP and lateral views."  (Schwartz Aff. ¶ 2.)  Dr. Bennie Martin Fulbright, an orthopedic surgeon, who treated Lewellen in Tennessee, also agrees that the fracture is visible from the June 8 x-rays.  (Fulbright Aff. ¶ 7.)

Lewellen passed several hours in jail with this, as of yet, undetected burst fracture.  Around 9:00 p.m. Officer McPherson went back to Lewellen's holding cell to check on another inmate.  He saw Lewellen crying in pain and noticed that Lewellen had urinated all over himself.  Lewellen told McPherson that his back hurt around the L5 vertebrae.  McPherson asked if Lewellen had any medical training and Lewellen responded that he did.

McPherson left the cell to call the jail nurse, who, when informed that Schneck had released Lewellen, instructed McPherson to give Lewellen some Tylenol.  Unsatisfied, McPherson called Schneck's Emergency Department directly.  He spoke

with Defendant Sharon Duffield[8] who said she would check with a physician and call McPherson back.

As promised, Nurse Duffield called McPherson back shortly after 11:00 p.m. and said that someone had re-reviewed the x-ray and found an abnormality.  For some reason Duffield instructed McPherson not to notify Lewellen.  It is unclear from the record what the relationship between Schneck and the county jail was, but McPherson testified in his affidavit that the department could not take Lewellen back to Schneck unless Schneck "ordered" it.  Despite notifying McPherson that there was an abnormality in his x-ray, Duffield told McPherson not to bring Lewellen back to the hospital and did not give any instructions as to a proper treatment.

Officer McPherson was so upset with the nurse's response that he contacted the jail commander imploring him to get medical help for Lewellen.  The commander suggested that since they could not transport a detainee to Schneck, they might release Lewellen on his own recognizance.  To do this, McPherson had to fill out paperwork for an Own Recognizance Order and submit it to judge.  This was done and an ambulance was called to pick up Lewellen.

 Before the ambulance arrived, McPherson went back to the holding cell to tell Lewellen that medical help was being secured.  He noticed blood on the wall of the cell

---

[8]  Although the report McPherson made contemporaneously listed the nurse's name as "Sandra" a reasonable jury could conclude that this nurse was Sharon Duffield.  Nurse Duffield was on call at the time and Officer McPherson claims to have received a call from Nurse Duffield regarding this case in 2005.

and looked at Lewellen, finding a deep laceration on his arm that had not been treated in any way.  The cut still had grass and dirt in it.

At 1:00 a.m., June 9, 2003, Lewellen arrived back at Schneck.  A CT scan of his spine performed at Schneck revealed that during the night Lewellen spent in jail, a fragment of bone from the burst fracture has displaced and was impinging on his spinal column.  Lewellen was later transported to Methodist Hospital in Indianapolis and was operated on by Dr. David Schwartz.

Despite the operation, Lewellen suffered from permanent neurological defects as a result of this injury.  Lewellen cannot urinate or defecate on his own; he suffers from some sexual dysfunction.  Dr. Schwartz believes that had Lewellen been properly treated on June 8, 2003, instead of discharged, he "more likely than not [] would have remained neurologically intact."  (Schwartz Aff. ¶ 10.)

## III.    Discussion

Lewellen sues four individuals and the hospital.  He sues Duffield, Davis, Reisert, and Alexander under 42 U.S.C. § 1983 for violating his Fourteenth Amendment rights as a pretrial detainee to adequate medical care.  He also sues the hospital for violating the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd.  The court will address the § 1983 claims first.

-9-

**A.     42 U.S.C. § 1983**

Lewellen sues two doctors and two nurses involved in his treatment at Schneck from June 8-9, 2003, under 42 U.S.C. § 1983 for violating his Fourteenth Amendment right to adequate medical care.  When in the custody of state or local authorities, a pretrial detainee is required to receive access to adequate medical care pursuant to the Due Process Clause of the Fourteenth Amendment.  *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002).  A pretrial detainee's due process right to medical care is violated when a state official "acts with deliberate indifference toward the detainee's serious medical needs."  *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (compiling several cases).

All four individual Defendants argue that they should be granted summary judgment for the same three reasons.  First, they are not state actors as required by the Fourteenth Amendment and 42 U.S.C. § 1983.  Second, Lewellen was not in state or local custody while he received treatment at Schneck.[9]  Third, even construing the facts most favorably to Lewellen, they were not deliberately indifferent to his serious medical needs.

**1.     State Action and Under Color of State Law**

To be liable under 42 U.S.C. § 1983, not only must an individual violate a plaintiff's rights secured by the Constitution and laws of the United States, the individual

---

[9]  Dr. Reisert in contrast to the other Defendants did not argue in his brief that Lewellen was not in state custody when he arrived at Schneck.

must also be acting under color of state law.  *Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003) (citing *West v. Adkins*, 487 U.S. 42, 48 (1988)).  The right secured by the Constitution in this case is the right, guaranteed through the Fourteenth Amendment, to adequate medical care for a pretrial detainee.  Therefore, Defendants must also be state actors because "it is well established that the Fourteenth Amendment 'erects no shield against merely private conduct, however discriminatory or wrongful.'"  *Wade v. Byles*, 83 F.3d 902, 904 (7th Cir. 1996) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).  Conduct that satisfies this state action requirement of the Fourteenth Amendment will also satisfy the under color of state law requirement of § 1983.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982).

"[S]tate employment is generally sufficient to render the defendant a state actor . . . ."  *Id.* at 935 n.18; *but see Polk County v. Dodson*, 454 U.S. 312 (1981) (holding public defender not a state actor).  On the other hand, the actions of private parties working as independent contractors for the state are not automatically transformed into state actions, even if the contractor works exclusively for the government.  *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982).

Yet sometimes the action of an independent contractor is considered state action.  *See, e.g.*, *West*, 487 U.S. at 57.  The essential question is whether the nominally private conduct is properly attributable to the state.  *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Lugar*, 457 U.S. at 924. This inquiry is a fact-intensive one that "is a matter of normative judgment, and the criteria lack rigid simplicity."  *Brentwood Academy*, 531 U.S. at 295; *see also Tarpley v.*

-11-

*Keistler*, 188 F.3d 788, 791 (7th Cir. 1999).  As the Court has explained: "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government."  *Brentwood Academy*, 531 U.S. at 295-96.  The Supreme Court has, however, listed three broad categories where it has treated a nominally private entity as a state actor:

> We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," *Pennsylvania v. Board of Directors of the City Trusts of Philadelphia*, [353 U.S. 230, 231 (1957)] (per curiam), when it has been delegated a public function by the State, *cf.*, *e.g.*, *West v. Atkins* [487 U.S.] at 56; *Edmonson v. Leesville Concrete Co.*, [500 U.S. 614, 627-628 (1991)], when it is "entwined with governmental policies," or when government is "entwined in [its] management or control," *Evans v. Newton*, [382 U.S. 296, 299 (1966)].

*Id.* at 296.

In this case, Defendant nurses are both employees of Schneck, a county-owned hospital.[10]  While the court is mindful that not every action by a state employee is state action, *see*, *e.g.*, *Perkins v. Rich*, 204 F. Supp. 98 (D. Del. 1962) (police officer swearing

---

[10]  Dr. Alexander citing a district court case from South Carolina, *Mitchell v. Chontos*, 756 F. Supp. 243, 247-48 (D.S.C. 1990) (adopting report and recommendation of magistrate judge), argues that Schneck itself is not a state actor.  The court disagrees.  A county-owned public hospital, like a public school or a municipal park, is a state actor subject to the proscriptions of the Fourteenth Amendment.  *Beedle v. Wilson*, 422 F.3d 1059, 1070 (10th Cir. 2005) ("Subsequent cases from our court have held, with little fanfare, that public trust and county hospitals are properly deemed state actors for § 1983 purposes."); *McKeensport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 528 (3d Cir. 1994) ("Courts commonly hold a state agency, like a county hospital district, for example, is a state actor even though it is not engaged in actions that are traditionally the exclusive province of the state."); *see also Dunn v. Washington County Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005) (analyzing county hospital's actions as if a state actor).

out complaint as private citizen not state action), Plaintiff alleges that his constitutional rights were violated by the nurses' actions related to their government employment, not their private conduct.  This is generally enough to show that they exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *West*, 487 U.S. at 49; *see also Lugar*, 457 U.S. at 935-36 n.18.

Nurses Davis and Duffield argue that their actions cannot be attributed to the state and that "[a]ny attempt to attribute their actions to the State simply on the basis of their employment by Schneck Medical Center is feeble."  (Defs.' Br. 10.)  Defendants argue that if, as a general rule, Davis's and Duffield's conduct is considered state action, state-employed nurses everywhere will be subject to § 1983 suits from dissatisfied patients.  Whether or not nurses' potential exposure to § 1983 suits is really as great as Defendants contend, this has not protected public school teachers and officials who violate students' constitutional rights from liability, *e.g.*, *Doe v. Smith*, 470 F.3d 331, 340-41 (7th Cir. 2006) (public school teacher acting under color of law when he sexually abused student).  Neither should it protect state-employed nurses who violate patients' constitutional rights.

Unlike Davis and Duffield, Defendant doctors are not nominally employees of the hospital or the County.  Like most doctors working for hospitals, Defendants are employed as independent contractors.  *See* Sylvia A. Law, *Do We Still Need A Federal Patients' Bill of Rights*, 3 Yale J. Health Pol'y L. & Ethics 1, 15 (2002).  At the time of Plaintiff's treatment at Schneck, Dr. Reisert was an employee of Jackson County

-13-

Emergency Physicians, a private entity which contracted with Schneck to provide physician services at the Emergency Department.  Dr. Alexander was an employee of Dr. Staib, who in turn was an independent contractor with Schneck to provide radiological services.

Plaintiff argues that although Reisert and Alexander are nominally private actors, their actions in this case are properly attributable to the state.  In support of his argument, Plaintiff cites *West v. Adkins*, 487 U.S. 42.  In *West*, the Supreme Court held that a physician who contracted with the prison system to provide medical services to prisoners could be a state actor for the purposes of the Eighth Amendment.  *Id.* at 54.[11] The court explained that although the contractual relationship between the doctor and state was not the same as other state employees, "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State."  *Id.* at 55-56.  In essence, the state delegated an affirmative constitutional obligation—medical treatment for inmates—to Dr. Adkins, who, in performing this function, was a state actor.  *Id.* at 56.

As the Supreme Court explained, there were significant policy reasons for finding state action.  As a prisoner, West could only receive medical treatment from someone approved by the state to treat him.  As the Court explained:

---

[11] The analysis for an Eighth Amendment claim for failure to provide adequate medical care to an inmate is the same as a Fourteenth Amendment claim for failure to provide adequate medical care to a pretrial detainee.  *See infra*.

-14-

> If Doctor Adkins misused his power by demonstrating deliberate indifference to West's serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care.

*Id.* at 55.   If a doctor who contracts with the state to provide inmate medical care is not liable under § 1983, inmates are "deprive[d] . . . of the means to vindicate their Eighth Amendment rights."  *Id.* at 56.  Importantly in *West*: "[1] The State bore an affirmative obligation to provide adequate medical care to West; [2] the State delegated that function to respondent Atkins; and [3] respondent voluntarily assumed that obligation by contract."  *Id.*

Dr. Reisert urges that emergency services, like those performed in this case, are distinguishable from the in-prison physician services in *West*.  He cites *Sykes v. McPhillips*, 412 F. Supp. 2d 197 (N.D.N.Y. 2006) (Hurd, J.), where the district court granted summary judgment for defendant physician on a § 1983 claim because he was not a state actor.  Plaintiff inmate was brought to a private hospital where defendant was an emergency room doctor.  *Id.* at 199.  Plaintiff claimed that defendant physician was deliberately indifferent to his serious medical needs.  *Id.* at 200.  Defendant claimed that he was not a state actor; plaintiff argued that the private hospital regularly treated inmates, the physician contracted with the hospital to provide emergency services, and could, therefore, expect to treat inmates.  *Id.* at 203.  Further, defendant knew plaintiff was an inmate when he treated him.  *Id.*

The court rejected this argument relying partly on another Northern District of New York case in front of the same judge, *Nunez v. Horn*, 72 F. Supp. 2d 24 (N.D.N.Y. 1999) (Hurd, J.).  In *Nunez*, defendant physician performed orthopedic surgery on an inmate in a private hospital; the court granted summary judgment for defendant because he was not a state actor.  The court distinguished *West* because the physician performed the surgery not in a prison hospital—"subject to all of the pressures and constraints resulting from security concerns"—but in a private hospital—"a much more physician-controlled environment."  *Id.* at 27.  Also the physician in *Nunez* had not contracted with the Bureau of Prisons or the state to provide services to inmates.  *Id.*

The court in *Sykes* found that these reasons applied in the case before it plus an additional reason: while the physician in *Nunez* accepted the inmate as a referral, the physician in *Sykes* had one encounter with the inmate for emergency treatment.  *Sykes*, 412 F. Supp. 2d at 204.  As the district court in *Sykes* explained in holding that the private hospital was also not a state actor, federal EMTALA law requires a hospital participating in the federal Medicare program to treat all patients who arrive at the emergency department.  *Id.* at 203.  "Willingness to accept patients under these circumstances cannot be construed, even impliedly, as contracting to provide emergency medical services [for inmates]."  *Id.*

In *Sykes*, the court reasoned that the strong policy reasons for holding the physician to constitutional standards were outweighed by the fact that the private hospital and doctors were conscripted through EMTALA to accept every patient whether a prisoner or not.  *Id.* ("However compelling this policy concern, it is not likely that

-16-

Congress intended to confer state actor status through this interpretation of EMTALA and there is no indication in *West* that the Supreme Court would extend the scope of such status to all providers of care to prisoners without an express contract.").  The court need not discuss the persuasiveness of that finding, however, because the court agrees with Plaintiff that the reasoning of *Sykes* is inapplicable to this case because Schneck, unlike the hospitals in those cases, is public.[12]

The strong normative reasons for finding state action in this case as articulated in *West* are not offset by any other policy.  The concern in *Sykes* of confusing conscription of private actors through EMTALA with a private actor voluntarily accepting responsibility for a public function is not applicable here.  Schneck is a public hospital that ultimately shares a constitutional responsibility to provide pretrial detainees with medical care.  Even without EMTALA or an express contract with the State Police, it would have to treat pretrial detainees presented to it within the bounds of the Fourteenth Amendment.[13]  That Schneck delegated its constitutional responsibility to treat pretrial detainees to independent contractors—parties who voluntarily accepted the delegation

---

[12]  Plaintiff also argues that Schneck's medical staff worked in concert with the jail staff and that for this reason, the doctors should be considered state actors.  Plaintiffs point to Dr. Reisert's testimony that his released Lewellen into a "watched atmosphere" and was aware that the jail would not take prisoners with blood alcohol levels above .30%.  But this is hardly a sufficient nexus between the state and private actors to attribute their actions to the state.  *Cf. Brokaw v. Mercer County*, 235 F.3d 1000, 1016 (7th Cir. 2000) (listing elements to establish § 1983 liability through a conspiracy theory).

[13]  Further, there appeared to be some sort of delegation accepted by Schneck—after all, Officer McPherson testified that he could not transport Lewellen to Schneck unless "ordered" by Schneck personnel.

through contract—should not deprive Plaintiff of a chance to vindicate his constitutional rights.

Further, the court respectfully disagrees with the Northern District of New York that there is any meaningful distinction between situations like *Nunez* and *West* based on where the inmate is treated.  While the Court in *West* mentioned the effect of the correctional setting on professional judgment, 487 U.S. at 56 n.15, this court is more persuaded by *Conner v. Donnelly*, 42 F.3d 220 (4th Cir. 1994).  In *Conner v. Donnelly*, the United States Court of Appeals for the Fourth Circuit reversed summary judgment in favor of defendant doctor on the issue of state action, despite the fact that the doctor did not have a contractual relationship with the state.  The defendant doctor saw plaintiff inmate on referral from the prison physician.  *Id.* at 221-22.  Although the physician treated the inmate outside of the prison environment, the court found this distinction irrelevant, noting: "It is the physician's function while working for the state, not the place where he performs his duties, that determines whether he acts under color of state law." *Id.* at 226.  Further, "it is irrelevant . . . that Donnelly treated Conner in his office, where he treats regular patients. . . . Donnelly acted under color of state law, not because he treated Conner differently than other patients, but because the state authorized him to treat Conner in order to fulfill the state's constitutional obligation toward Conner." *Id.*[14]

---

[14] In his brief, Dr. Reisert attempted to distinguish *Conner* by noting that defendant doctor in that case was reimbursed by the state, whereas Lewellen's insurance paid for his treatment at Schneck.  However, this is irrelevant.  That Lewellen was billed and paid for his treatment does not alter the fact that the state was constitutionally obligated to provide him access to medical treatment if he was a pretrial detainee.

Drs. Reisert and Alexander argue that there was no agreement between them and the state to treat inmates and pretrial detainees.  However, they were employed by private entities that themselves voluntarily contracted with the state to provide general medical services.  Although from the evidence before the court it is not clear whether either entity contracted specifically to treat inmates or pretrial detainees, in reality, treating these types of patients was part of what they did under their contracts with the state.  It should not matter that the entirety of Defendants' contract with the state was not dedicated to performing affirmative constitutional obligations of the state.  *Cf. West*, 487 U.S. at 56 ("It is the physician's function while working for the State, not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is action under color of law.")

A trier of fact could determine the obligation to treat pretrial detainees and inmates was delegated to defendant doctors through Schneck.  If part of the doctors' contractual duties is a public function, the doctors should be held to the same constitutional standards that the state itself is prior to its delegation.  It should not matter that this public function was not explicitly stated in the contract; as long as it was a necessary (and presumably foreseen) part of fulfilling the contract, the independent contractors voluntarily accepted the public function delegated to them.

It is for these reasons that a trier of fact could find that the relationship between the state and the nominally private conduct in this case is functionally identical to that in *West*.  Indiana has an affirmative duty under the Fourteenth Amendment to provide

-19-

pretrial detainees with medical care.  To fulfill its obligation, it took Lewellen to Schneck, another arm of the state.  Schneck in turn delegated its affirmative obligation to the entities that employed Defendant doctors.  Through their contract with the state, these employers voluntarily assumed the responsibility.  Therefore, the court cannot say as a matter of law that Defendant doctors were not state actors.

This is not to say that as a matter of law, they were.  This highly factual analysis must be submitted to a trier of fact to determine whether given the circumstances of the relationship between the hospital, the state, and the independent contractors that a public function was delegated to Defendant doctors and, thus, that their actions in performing it are properly attributable to the state.  What is important at this stage of the proceedings is that a reasonable trier of fact might determine that the Defendant were state actors; therefore, on this issue, the Plaintiff survives summary judgment.

### 2.    Custody[15]

Defendants argue that even if they are state actors, Lewellen was not in custody when he arrived at Schneck on June 8, 2006.  Therefore, because the state has no

---

[15]  Only Dr. Alexander denied that Lewellen was in police custody in his answer; all other defendants, including Nurses Davis and Duffield, admitted that Lewellen was in police custody. (*See* Reisert Answer, Doc. 26, ¶ 43; Alexander Answer, Doc. 27, ¶ 43; Duffield, Schneck, Davis Answer, Doc. 28, ¶ 43).  However, Nurses Davis and Duffield argued in their brief that Lewellen was not in police custody as part of their denial that they were state actors.  To the extent that their judicial admission in the answer does not cover this argument, the court includes this section.

affirmative duty to provide emergency medical services, *see Hill v. Shobe*, 93 F.3d 418,

422 (7th Cir. 1996), Lewellen's constitutional rights were not violated regardless of

whether Defendants were deliberately indifferent to Lewellen's serious medical needs.

In *Salazar v. Chicago*, 940 F.2d 233 (7th Cir. 1991), the Seventh Circuit affirmed

a directed verdict against defendant police officers and for defendant paramedics.  The

court began by addressing the preliminary question of whether plaintiff was in custody.

*Id.* at 237.[16]  Plaintiff was in a motor vehicle accident while intoxicated and treated by

paramedics at the accident scene while police officers were present.  *Id.*  He later died

and his estate sued the paramedics and officers alleging they were deliberately

indifferent to his serious medical needs.  *Id.* at 235.  The court framed the question of

custody as: "whether Salazar was in custody, or, more precisely, free to leave and seek

help on his own while the paramedics treated him."  *Id.* at 237.  The court treated this as

a factual issue and noted: "Although [an officer] did not formally arrest [plaintiff] until

after the paramedics left, it may be that [the officers] would not have let [plaintiff] go, and

that the paramedics knew that [plaintiff] was not free to leave."  *Id.*

A jury would have ample evidence to find that Lewellen was in custody while at

the hospital.  First, Lewellen presented evidence that the police would not have let him

go while he was being treated at Schneck.  Most importantly, when Lewellen begged to

be allowed to stay and receive treatment after he was discharged, he was taken to jail.

---

[16]  Although the analysis was technically dicta because the paramedic-defendants in the case eventually conceded that plaintiff should be treated as a pretrial detainee, the framework developed by the Seventh Circuit in the case is still useful.

It could be inferred, then, that the troopers would not have let him go to receive treatment from another provider of his choosing half an hour earlier during his treatment. Also, in the probable cause determination paperwork, the police noted the time of arrest at 2:22 p.m., or the time they arrived at the accident scene; this is a good indication that in their mind, Lewellen was not free to leave during his stay at Schneck.

Second, Lewellen presented evidence that the staff knew he was in custody during his treatment at Schneck. The police were present at the hospital waiting for Lewellen to be discharged. When nurse Davis had trouble getting Lewellen to sign his discharge papers, she went to Trooper Drew and asked him to sign them. This is a clear sign that she believed the officers had custody and that Lewellen was not free to go. According to Plaintiff's facts, nurse Duffield had to know Lewellen was in custody when she spoke with Officer McPherson because McPherson was calling from the jail asking if he should bring Lewellen back to Schneck. A reasonable jury could determine, given these facts, that Lewellen was not free to leave and seek help on his own.

Defendants point out that Lewellen did not receive his *Miranda* warnings or notice of arrest until the time of discharge. But custody and formal arrest are not the same thing. *See id.* As long as Lewellen was not free to seek medical help on his own, he was in custody for purposes of a pretrial detainee's Fourteenth Amendment right to medical care. Defendant Reisert additionally argued in his brief that the Lewellen's insurance was billed for the medical treatment rather than the state. This fact is hardly dispositive. A trier of fact could still find that, given all of the other facts in favor of

finding custody, Lewellen's paying for the service does not prove that he was free to seek medical care on his own.

### 3.    Deliberate Indifference

Finally Defendants argue that even construing the facts in Lewellen's favor, they were not deliberately indifferent to his serious medical needs.  A pretrial detainee is entitled to access to adequate medical care by the Fourteenth Amendment.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  The rights of pretrial detainees "are at least as great as the Eighth Amendment protection available to a convicted prisoner."  *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 259 (7th Cir. 1996). Therefore, courts analyze a Fourteenth Amendment claim for denial of medical services under the Eighth Amendment standard.  *Higgins v. Corr. Med. Servs. of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999).

In order to prevail under the Eighth Amendment or the Fourteenth Amendment on a claim for denial of medical services, a prisoner or detainee must show "deliberate indifference to a prisoner's serious illness or injury."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Meeting this standard requires both an objective and a subjective element. Objectively, a condition must be serious, meaning "the failure to treat [the] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).  Subjectively, the defendants must have acted with deliberate indifference, in other words, they "[knew] of and disregard[ed] an excessive risk to [detainee's] health or safety; the official must both be

-23-

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A showing of negligence on the part of the official will not be enough to show deliberate indifference. *Estelle*, 429 U.S. at 106. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* On the other hand, plaintiffs do not have to show that the officials intended for the inmate to suffer harm. *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). "It is enough to show that the defendants actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (citing *Haley*, 86 F.3d at 641). This may be established by showing that "the danger was objectively so great that actual knowledge of the danger could be inferred." *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985); see also *Farmer*, 511 U.S. at 842.

That Lewellen satisfied the objective part of the test is beyond question. He arrived at Schneck on June 8, 2003, with an unstable burst fracture in his lower spine. Failure to treat the condition not only could lead to further significant injury, it did. Dr. Schwartz wrote in his affidavit that had Lewellen been treated properly rather than hastily discharged, he might have avoided any neurological damage. (Schwartz Aff. ¶ 10.) In their briefs, Defendants do not argue this part of the test.

They do argue that they were not deliberately indifferent to this serious medical need.  Defendant nurses argue that Lewellen failed to produce any evidence that they knew about his condition.  Without a showing that they actually knew he had a serious medical need, the failure to treat him is merely negligent, which does not rise to the level of a Constitutional violation.  *Snipes v. De Tella*, 95 F.3d 586, 590-91 (7th Cir. 1996).  But knowledge may be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  *Estate of Cole*, 94 F.3d at 262.

Plaintiff has demonstrated that there is a genuine issue of material fact on whether Dr. Reisert was deliberately indifferent to Lewellen's serious medical needs. According to evidence presented by Plaintiff, Dr. Reisert knew that Plaintiff had been in an automobile accident and was complaining of back pain.  However, the x-rays that Dr. Reisert ordered were being printed off almost contemporaneously to Lewellen's discharge.  Two doctors, Drs. Schwartz and Fulbright, testified that a burst fracture is clearly visible on the x-rays that were being printed off as Lewellen was discharged.  As explained above, a trier of fact could use this evidence to determine that Dr. Reisert ordered Lewellen discharged before even looking at these x-rays.  Given that Plaintiff was in an automobile accident and was in such visible agony that a State Trooper questioned the decision to discharge Lewellen, discharging Lewellen without looking at an x-ray was such a deviation from accepted professional judgment that a trier of fact

-25-

could easily determine that Dr. Reisert did not base his decision to discharge Plaintiff on it.  The § 1983 claim against Dr. Reisert survives summary judgment.

Given his role at the hospital, there is also a genuine issue of material fact as to whether Dr. Alexander was deliberately indifferent to Lewellen's serious medical needs despite Dr. Alexander's not looking at Plaintiff's x-rays until after he was discharged. According to Dr. Staib, who at the time was Dr. Alexander's boss, the reason for a second read of the x-rays is to verify that the initial read by the Emergency Department doctor, in this case Dr. Reisert, was correct.  (Staib Dep. 121, 125.)  If the radiologist reaches a different conclusion than the initial read, that result must be conveyed to the ordering physician.  Dr. Staib testified that this is usually done first by telephone and then that notification is documented.  According to Dr. Staib: "Unexpected positive results should be communicated directly and that communication should be documented."  (*Id.* at 130.)

Upon reviewing Lewellen's x-rays, Dr. Alexander claimed that he could not rule out a burst fracture.  Dr. Staib testified that the type of result that Dr. Alexander found in Lewellen's x-rays is that type of result that should have been directly communicated. (*Id.*)  There is no doubt that it was not; however, Dr. Alexander claims that he put the notes in the hospital's system for anybody to look at and that this is enough under hospital policy to fulfill any duty he had.  Given Dr. Staib's testimony, a trier of fact could determine that it was not enough.

Further, a trier of fact could determine that Dr. Alexander had enough information about Lewellen's situation for his failure to do more than post his notes to constitute deliberate indifference.  First, there is enough evidence for a trier of fact to determine that Dr. Alexander was aware of a risk of Plaintiff having a burst fracture and aware of a risk of that fracture getting worse, yet did nothing but passively issue an equivocal report without specifically notifying anyone.  Plaintiff claims that there is enough evidence for a trier of fact to determine that in the face of evidence that Plaintiff had a burst fracture, Dr. Alexander deliberately reported an equivocal reading of Plaintiff's x-rays in order to save the hospital embarrassment.  But even if a trier of fact does not go that far, it could easily determine that Dr. Alexander was aware of a significant risk that Lewellen had burst fracture.  Dr. Alexander himself admitted he knew there was at least a small risk.  (Alexander Dep. 128-29.)  Several doctors presented testimony that the burst fracture was obvious from the x-rays Dr. Alexander viewed the night of June 8, 2003.  Dr. Alexander claimed that what he saw could be an osteophyte, but that a fracture could not be excluded.  But Dr. Schwartz testified that no radiologist could confuse the fracture on the x-ray for an osteophyte.  (Schwartz Aff. ¶ 2.)

Dr. Alexander argues that even with knowledge of a risk to Lewellen, he was not deliberately indifferent to the serious medical needs to a pretrial detainee because he was not subjectively aware of the ramifications of his inaction.  In reality, Dr. Alexander's inaction carried significant consequences because Lewellen was in custody without access to medical care while bone fragments in his spine were causing permanent damage.  Had Dr. Alexander attempted to contact Dr. Reisert or the Jackson County

Jail to tell them either that more tests needed to be done because the previous results were inconclusive or that treatment should begin for a burst fracture, perhaps Lewellen would not have experienced any permanent damage.

But what is critical for the subjective prong of the deliberate indifference analysis is that Dr. Alexander was actually aware of these risks when he failed to notify Dr. Reisert or the Emergency Department of his findings. Dr. Alexander claims that he never knew that Lewellen was in custody while at the hospital or that he was taken to jail after he was released. Rather, he claims that he assumed that Lewellen was still in the hospital awaiting the diagnostic results. Perhaps Dr. Alexander, although aware of the risk to Lewellen, assumed that if Lewellen were still in significant pain a CT scan could reveal any fracture and that there was little risk of further harm to Lewellen while being watched in the hospital.

Yet a trier of fact could determine that Dr. Alexander is not being truthful about what he knew of Lewellen's situation that night. First, Dr. Alexander did not originally mention any of this in his deposition or his original affidavit. He originally claimed to have no memory of Lewellen's case at all and has subsequently added these key facts about what he assumed about Lewellen's remaining in the hospital. A trier of fact could infer that contrary to Dr. Alexander's claims, he did know that Lewellen was in custody and discharged from the hospital and therefore disregarded a serious risk to a pretrial detainee's health by doing nothing but post his equivocal report. Dr. Alexander wrote in

-28-

his contemporaneous report that Lewellen was drunk and combative.[17]  Schneck is also

a small, rural hospital with one Emergency Department Doctor on duty and one

radiologist on duty at the time Lewellen was originally brought to the hospital.  It is not a

far leap to infer that Dr. Alexander was aware of the circumstances of Lewellen's

drunken, supposedly combative interaction with hospital staff that afternoon, including

his being taken away by the police.  Had Dr. Alexander looked at Lewellen's hospital

records, he could have determined that Lewellen was discharged from the hospital and

did not sign his discharge papers.  Perhaps these types of interactions take place all the

time at Schneck and radiologists are completely unaware of the circumstances, but this

is a question of fact not to be decided on summary judgment.  Given this, a trier of fact

could determine that Dr. Alexander's failure to do anything but post his equivocal report

on the hospital system was demonstrating deliberate indifference to Lewellen's serious

medical needs.

As for the nurses, they both argue that their duty was to obey the orders of

physicians and to notify the physicians of any changes in the patient's condition.  This,

they argue, is exactly what they did.  According to Davis, Dr. Reisert released Lewellen

and she was only obeying his orders.  But Davis cannot rely on the doctor's release to

abdicate all her responsibility when Lewellen's needs were so obvious.

---

[17]  Dr. Alexander also wrote that additional tests could be performed when the patient
was less agitated.  It could be argued that this demonstrates his belief that Lewellen was still in
the hospital.  However, it is equally consistent with knowledge that a patient is in police custody
and can be ordered back to the hospital for additional tests.

The Eighth Circuit in *Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997), upheld the verdict from a bench trial finding a nurse deliberately indifferent to the serious medical needs of an inmate who went into premature labor.  Plaintiff, seven months pregnant, had a history of premature labor. When she had bloody show, she was transferred from the Iowa Medical and Classification Center ("IMCC"), where defendant was a nurse, to the University of Iowa Hospitals.  The University determined that she was not in active labor and released her to the IMCC, but instructed that she should return to the University "if her contractions became painful, regular, and separated by ten minutes or less." *Id.* at 782.  The next day at 7:00 pm, plaintiff had extreme pain in her lower abdomen and reported to the prison nurse who told her to return when the contractions were six to seven minutes apart.  At 9:30 pm, she returned claiming her contractions were six minutes apart, but defendant could not feel any contractions.  Plaintiff returned to her living unit and "sat on the edge of her bed in increasing pain until 11:25 pm." *Id.* at 783.  Finally, she started screaming in pain and laid in the fetal position on the floor. When the nurses came, they still could not feel any contractions.  But when they asked her to stand, she expelled fifteen cubic centimeters of dark red blood.  They then transferred her to the University where her baby was born.

The trial court found that defendant was deliberately indifferent through her unnecessary delay in transferring plaintiff to the University.  Defendant argued that she was following the doctors' instructions that plaintiff not be returned to the hospital until her contractions were painful, regular and separated by ten minutes or less.  Despite the doctor's instructions, the district court concluded that defendant had actual

-30-

knowledge based on the obviousness of plaintiff's serious medical need.  The circuit

court held that this conclusion was not clearly erroneous.  The court explained:

> [Plaintiff's] propensity for precipitous labor and premature delivery was
> well-documented and expressly noted by prison officials in Coleman's
> medical records, to which [defendant] had been exposed, and constituted
> the sole reason for Coleman's placement at IMCC.  From this evidence, a
> trier of fact could have found that [defendant] had actual knowledge of the
> risk of pre-term labor.

*Id.* at 786.

The same inference can be made in the case of Nurse Davis.  When Trooper

Drew saw Lewellen at the hospital, Lewellen "was insistent that the hospital had not

examined him sufficiently and that he had terrible pain in his lower back."  (Drew Aff. ¶

7.)  Drew even asked Nurse Davis directly if the hospital was done examining him.  (*Id.*)

Nurse Davis's response was that Lewellen was just drunk and that of course he would

have some pain after a motor vehicle accident.  But Lewellen was in such pain that he

could not put any weight on his legs and had to be put into a wheelchair.  Nurse Davis

was present for all of this.  Trooper Drew observed Lewellen in so much pain that he

deviated from standard practice and cuffed him in the front rather than the back.

Trooper Drew also specifically told the jailers upon dropping Lewellen off that despite

the hospital's release, Lewellen was in so much pain that someone should keep a close

eye on him.  (Drew Aff. ¶ 11.)

Given the amount of pain that Drew observed, Lewellen's inability to place any

weight on his legs, and his pleading to Nurse Davis that he was in tremendous pain and

needed to see a doctor, the jury could conclude that Davis was aware of Lewellen's serious medical need.  She need not have looked at Lewellen's x-ray to know that there was something wrong, especially given the fact that the Trooper Drew and Officer McPherson seemed to know something was wrong.   There were numerous red flags waving from which a jury could conclude that Nurse Davis was deliberately indifferent to a serious medical need of Lewellen.

Given the facts surrounding Nurse Duffield's phone conversation with Officer McPherson, a trier of fact could also determine that she was deliberately indifferent. Defendant Duffield first argues that she was not the nurse that spoke with Officer McPherson.  She points out that the police log detailing the conversation claims that the nurse's name was "Sandra", while her name is "Sharon."  But this question of fact must be construed in favor of Plaintiff.  The trier of fact could find that nurse McPherson spoke with was Duffield, and not some other nurse named Sandra, given that those names are similar and that Duffield was working at the time.  Officer McPherson also claims that he received a call from Duffield herself essentially admitting that she was the one who spoke with him and scolding McPherson for telling others what she had said that night.

Nurse Duffield certainly knew that Lewellen had a serious medical condition because she herself informed the police that Lewellen's x-ray came back with an abnormality.  Bizarrely, according to McPherson, she instructed the police not to tell Lewellen of this result and specifically told Officer McPherson not to bring Lewellen back to Schneck.  Officer McPherson further claims that he could not take Lewellen to

Schenck without someone there ordering him; Defendants present no evidence to counter his statement.  Given that, a reasonable jury could find Nurse Duffield acted with deliberate indifference when she called to present this information without working in any way to provide assistance.  She knew that there was an abnormality in his x-ray and she knew that Lewellen could not leave the jail to receive his own medical care.  There are many possible explanations for her behavior that would stop short of deliberate indifference; however, Defendants have presented no evidence which would preclude a jury as a matter of law from concluding that it was simply deliberate indifference that caused her to act the way she did.  Therefore, a jury will be allowed to make that determination.  The motion for summary judgment is **DENIED** as to all the § 1983 claims against the individual Defendants.

### B.     EMTALA

Plaintiff also presents a claim against Schneck under the Emergency Medical Treatment and Active Labor Act ("EMTALA").  Schneck argues that it should receive summary judgment on this claim because even construing the facts in Lewellen's favor, they met the requirements of EMTALA.   In the alternative, Schneck seeks partial summary judgment ruling that the caps on recovery under Indiana's Medical Malpractice Act work to limit Schneck's liability to $250,000.

### 1.        Substance of the EMTALA Claim

The Emergency Medical Treatment and Active Labor Act (EMTALA) was passed
to combat the problem of "patient dumping;" that is, the practice of transferring or
discharging indigent or non-insured patients while their emergency conditions worsen.
*Johnson v. Univ. of Chi. Hosps.*, 982 F.2d 230, 233 n.7 (7th Cir. 1993).  There are two
requirements for certain federally-funded hospitals under EMTALA.  First, a hospital
"must provide for an appropriate medical screening examination within the capability of
the hospital's emergency department . . . to determine whether or not an emergency
medical condition . . . exists" 42 U.S.C. § 1395dd(a).[18]  Second, if an emergency

─────────────────────

[18]  The relevant portion of 42 U.S.C. § 1395dd reads:

(a) Medical Screening Requirement

In the case of a hospital that has a hospital emergency department, if any
individual (whether or not eligible for benefits under this subchapter) comes to
the emergency department and a request is made on the individual's behalf for
examination or treatment for a medical condition, the hospital must provide for an
appropriate medical screening examination within the capability of the hospital's
emergency department, including ancillary services routinely available to the
emergency department, to determine whether or not an emergency medical
condition (within the meaning of subsection (e)(1) of this section) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor

(1) In general

If any individual (whether or not eligible for benefits under this subchapter) comes
to a hospital and the hospital determines that the individual has an emergency
medical condition, the hospital must provide either--

(A) within the staff and facilities available at the hospital, for such further medical
examination and such treatment as may be required to stabilize the medical
condition, or

(B) for transfer of the individual to another medical facility in accordance with
(continued...)

-34-

medical condition is detected by this screening, the patient may not be discharged until

he or she has received a stabilizing treatment or transferred when certain criteria are

met.  § 1395dd(b)(1), (c).  The statute authorizes a patient harmed by a hospital's failure

to adhere to either of these two requirements to sue the hospital. § 1395dd(d)(2).

A hospital is only required to stabilize an emergency medical condition that they

actually know about.  *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir.

1996).  Schneck claims that it performed an appropriate medical screen and thus that

the stabilization requirement was not triggered.  Therefore, although Lewellen presents

two separate claims under EMTALA, one for screening, the other for stabilization, they

necessarily collapse into one.  The court need only analyze Lewellen's screening claim.

If Schneck fulfilled the screening requirement, then the stabilization claim necessarily

fails too because the stabilization requirement was not triggered.  If Schneck did not

fulfill the screening requirement, it is liable and there is no need to analyze the

stabilization requirement separately.

EMTALA is not a national medical malpractice statute imposing a standard of

care on hospital emergency rooms.  *See Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d

708, 713 (4th Cir. 1993).  A hospital that conducts an appropriate medical screen yet

fails to detect, or misdiagnoses, an emergency medical condition—even if negligent and

liable under medical malpractice—is not liable under EMTALA.  *Bryant v. Adventist*

---

[18](...continued)
subsection (c) of this section.

*Health Sys./W.*, 289 F.3d 1162, 1166 (9th Cir. 2002); *Marshall on Behalf of Marshall v.*

*E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322-23 (5th Cir. 1998).

"EMTALA aims at disparate treatment."  *Brooks*, 996 F.2d at 713.  Therefore, a

patient must show that he was treated differently from other patients.  *Williams v.*

*Birkeness*, 34 F.3d 695, 697 (8th Cir. 1994).  The Ninth Circuit explained in *Jackson v.*

*East Bay Hospital*, 246 F.3d 1248, 1256 (9th Cir. 2001) there are two ways to prove an

inappropriate screening:

> We hold that a hospital satisfies EMTALA's "appropriate medical
> screening" requirement if it provides a patient with an examination
> comparable to the one offered to other patients presenting similar
> symptoms, unless the examination is so cursory that it is not "designed to
> identify acute and severe symptoms that alert the physician of the need for
> immediate medical attention to prevent serious bodily injury."

*Id.*  (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (9th Cir. 1995)).

Defendants correctly point out that Plaintiff presented no evidence that the

screen performed on him differed from any other patient's screen.  However, a

reasonable jury could conclude that the screen performed was so cursory that it was not

designed to identify acute and severe symptoms and thus did not meet the

requirements of EMTALA.  In its brief, Schneck barely argues Reisert's screen was

more than cursory.  Schneck argues only that Reisert did *something* and found

Lewellen had a normal neurological exam.  Defendants claim: "Based upon his

examination, Dr. Reisert brought to bear on the case his medical judgment and

concluded Mr. Lewellen could be safely discharged."  (Defs.' Br. 19.)

-36-

But according to the evidence presented by the Plaintiffs, the x-rays ordered by Dr. Reisert were being printing off as Lewellen was being discharged.  A jury could conclude that either Dr. Reisert did not even bother to look at them or looked at them so casually that he missed what two other physicians said was obvious: that the x-rays demonstrate that Lewellen had a burst fraction in his spine.  If Reisert did not study the x-rays how could his screen be designed to identify acute and severe symptoms?  Lewellen's stay at the hospital was alarmingly brief considering he was in a motor vehicle accident and complaining of severe back pain so bad he could not stand or sit in a chair correctly.  Lewellen still had a bleeding gash in his arm with grass and dirt in it when he arrived at prison.  The court is mindful that EMTALA's screening requirement means something more than an inadvertent failure to follow the regular screening process in a particular case.  *Cf. Summers v. Baptist Med. Cen. Arkadelphia*, 91 F.3d 1132, 1139 (8th Cir. 1996) (citing *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192-93 (1st Cir. 1995).  But this scenario is so grave that a jury could conclude that rather than a negligent deviation from normal practice, the screening requirement was simply not met.  For this reason, Schneck's motion for summary judgment will be **DENIED**.

### 2.      Medical Malpractice Act

Schneck argues that if the EMTALA claim survives summary judgment, the court should rule that Indiana's Medical Malpractice Act limits Lewellen's total recovery to $1.25 million and Schneck's liability to $250,000.  EMTALA authorizes suit for personal harm but limits the damages recoverable to "those damages available for personal

injury under the law of the State in which the hospital is located."  42 U.S.C. §
1395dd(d)(3)(A).

Two cases decided in the Southern District of Indiana have held that this
language commands that limits on damages under Indiana Medical Malpractice Act
apply to EMTALA claims that fall within Indiana's definition of malpractice.  *See Valencia
v. St. Francis Hosp. & Health Ctr.*, No. 1:03-cv-0252-LJM-WTL, 2004 WL 963712 (S.D.
Ind. March 1, 2004) (McKinney, C.J.); *Reid v. Indianapolis Osteopathic Med. Hosp.*, 709
F. Supp. 853 (S.D. Ind. 1989) (Barker, J.).  Some United States Court of Appeals
decisions have also held state medical malpractice damage limits applicable to
EMTALA claims.  *See Smith v. Botsford Gen. Hosp.*, 419 F.3d 513 (6th Cir. 2005);
*Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994).

Indiana's Medical Malpractice Act limits the "total amount recoverable for an
injury or death of a patient" to "$1,250,000."  Ind. Code § 34-18-14-3(a)(3).  However, a
qualified health care provider is "not liable for an amount in excess of two hundred fifty
thousand dollars ($250,000) for an occurrence of malpractice." § 34-18-14-3(b).  A
patient's compensation fund makes up "[a]ny amount due from a judgment or settlement
that is in excess of the total liability of all liable health care providers . . . ."  § 34-18-14-
3(c).  A surcharge levied on all health care providers is deposited into the fund.  § 34-
18-6-1.

Defendant argues that if the previous rulings of the Southern District are
followed, these damage limits should be applied and, thus, Schneck can be liable for no

more than $250,000.[19]  Although Plaintiff asks the court to hold differently than the opinions of Chief Judge McKinney and Judge Barker, the court is reaching the same result as those and like the Fourth and Sixth Circuits concludes that the medical malpractice limits should apply to cap Plaintiff's recovery.

Plaintiffs argue that the plain language of the EMTALA statute should be applied, meaning that the medical malpractice caps would not be incorporated.  According to Plaintiffs, the legislative history of EMTALA contains references to medical malpractice; therefore, Congress was familiar with the term and chose not to apply it.  The statute indicates that "those damages available for personal injury" rather than a specific reference to medical malpractice.  In Indiana, there are no general limits to the amount recoverable for personal injury.  Plaintiffs also argue that the language of the provision is permissive rather than prohibitive and thus should not be read as overly restrictive.

But these arguments are not persuasive in the face of the legislative history of EMTALA.  In *Power v. Arlington Hospital Association*, the Fourth Circuit looked at the legislative history and found that Congress intended—contrary to Plaintiff's assertion—for medical malpractice caps to apply, when applicable to the claim by state law.  A broad phrase like "personal injury" was used, the court wrote, "so that it would

---

[19]  Neither of previous opinions from the Southern District addressed how the patient's compensation fund relates to EMTALA.  Judge Barker's opinion in *Reid v. Indianapolis Osteopathic Medical Hospital* incorporated the qualified provider limit ($100,000 at the time, $250,000 now) without a discussion of whether the patient's compensation fund would make up any excess liability.  *See Reid*, 709 F. Supp. at 854.  Chief Judge McKinney's opinion discussed only the higher total patient recovery limit ($1.25 million) and did not express an opinion on whether the qualified provider limit would also apply to the hospital.  *See Valencia*, 2004 WL 963712 at *5.

not be necessary to delineate each and every type of limitation on damages, e.g.,

limitations on punitive damages, noneconomic losses, and malpractice damages caps,

that the states might have enacted." *Power*, 42 F.3d at 862.  The House Committee on

the Judiciary expressed concern about "'the potential impact of these enforcement

provisions on the current medical malpractice crisis.'"  *Id.* (quoting H.R. Rep. No. 241,

99th Cong., 1st Sess., pt. 3, at 6).  In particular, the Committee noted the impact of

severe penalties on hospitals in rural and poor areas.  *Id.*  When the Conference

Committee modified the bill to its final form, it commented "[t]he courts are directed, on

the issue of damages, to apply the law of the State in which the violating hospital is

located, for actions brought by a harmed individual . . . ."  *Id.* (quoting H.R. Conf. Rep.

No. 99-453, 99th Cong., 1st Sess., 131 Cong. Rec. H13093, H13226 (daily ed. Dec. 19,

1985)).  So, as noted by the *Power* court, the reference in EMTALA to damages

available in the state where the hospital is located was appropriately broad to cover all

types of state law limits on damages.

Judge Barker of this court also noted in *Reid* that:

Congress "was clearly aware of a growing concern in some states that
excessive damage awards were fueling a medical malpractice 'crisis,'" and
that Congress apparently wished to preserve state-enacted ceilings on the
amount of damages that could be covered in EMTALA through the
incorporation of § 1395dd(d)(2)(A).

*Id.* (quoting *Reid*, 709 F.Supp. at 903-04).[20]

_____

[20]  The statute itself also contains a provision about preemption of state law, § 1395dd(f)
states that EMTALA does not preempt state law unless the state law "directly conflicts with a
(continued...)

But the more critical analysis is how Indiana law treats the type of conduct of which the plaintiff complains.  In other words, does Indiana law limit the damages from medical treatment as a personal injury?  Clearly it does.  *See* Ind. Code § 34-18-14-3.  In Indiana, malpractice is defined as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider."  Ind. Code § 34-18-2-18.  This is a broad definition, but does not include every claim of a patient against a health care provider.  *See, e.g.*, *Pluard v. Patients Compensation Fund*, 705 N.E.2d 1035, 1041-42 (Ind. Ct. App. 1999) (falling surgical lamp improperly installed not a health care issue); *Methodist Hosp. of Ind., Inc. v. Ray*, 551 N.E.2d 463, 466 (Ind. Ct. App. 1990) (contracting Legoinnaire's disease while patient not a situation unique to hospitals); *Doe v. Madison Ctr. Hosp.*, 652 N.E.2d 101, 104-05 (Ind. Ct. App. 1995) (sexual assault by counselor "cannot be recast to speak in the language of medical malpractice.").

In his brief, Lewellen does not argue that this case is outside Indiana's definition of medical malpractice and, therefore, not subject to its damage limitations.   So, the court need not explore this issue in depth, but the court notes that Lewellen's injuries appear to be firmly within the Medical Malpractice Act and thus should be subject to the Medical Malpractice Act's limits on damages.  Yet Lewellen argues that for policy reasons, the court should apply the Act's limits piecemeal, applying only the $1.25 million total patient recovery cap, not the $250,000 qualified provider cap.  In other

---

[20](...continued)
requirement of this section."  In his brief, Plaintiff does not argue that the medical malpractice cap directly conflicts with a requirement of EMTALA.

words, Schneck, despite the fact it would only be liable for $250,000 under the Medical

Malpractice Act should be liable for all damages up to $1.25 million.  Lewellen claims

that he can not petition the patient's compensation fund to make up any difference

between Schneck's $250,000 limit and any additional damages up to $1.25 million.  If

Schneck can only be liable for $250,000, the Act's $1.25 million cap is meaningless as

applied to EMTALA claims falling within the Act.  Indiana Code § 34-18-14-3(b), Plaintiff

claims, must be read in light of 3(c), which says that any excess liability must be paid by

the patient compensation fund.

Applying the $250,000 limit to Schneck rather than the $1.25 million total liability

limit makes more sense than applying bits and pieces of the Medical Malpractice Act

limitations, given the legislative history cited in *Power.*  Congress, concerned with the

weight of excessive judgments on rural institutions, like Schneck, incorporated the

state's limitations on claims to limit EMTALA claims that would have been limited under

state law.  The State of Indiana limits any provider's liability on a malpractice claim to

$250,000.  While part of that scheme includes a patient's compensation fund that

makes up the excess liability, it appears that Congress intended EMTALA damages to

fit within the limits of that system.  For these reasons, Defendant Schneck's motion for

partial summary judgment will be **GRANTED**.[21]

---

[21]  Further, Lewellen's premises are suspect.  First, it is not clear that the Fund could not
be petitioned to pay out the excess damages on an EMTALA claim.  For example, the
Wisconsin Supreme Court has held that its patient's compensation fund must pay on EMTALA
claims. *Burks v. St. Joseph's Hosp.*, 569 N.W.2d 391, 402 (Wis. 1999).  In *Patient's Comp.
Fund v. Hicklin*, 823 N.E.2d 705 (Ind. Ct. App. 2005), a patient petitioned the Fund after settling
with a hospital on both his EMTALA and medical malpractice claim.  (Although the Court of
Appeals of Indiana held that the patient's estate could not access the fund, the reason was

(continued...)

## IV.    Conclusion

The Fourteenth Amendment does not proscribe private conduct in any way; therefore, a violation requires state action.  However, a trier of fact could find all four individual Defendants to be state actors.  Further, a trier of fact could find that all four were deliberately indifferent to Lewellen's serious medical needs. Therefore, Defendants' motions for summary judgment on the § 1983 claim will be **DENIED**. Plaintiff also presented enough evidence to survive summary judgment on his EMTALA claim against Defendant hospital and that motion will also be **DENIED**.  However, the damages caps of the Indiana Medical Malpractice Act will apply to limit Schneck's potential EMTALA liability to $250,000.

The Court has concluded that there is not a need for oral argument on the Motions for Summary Judgment, therefore, the Request for Oral Argument (Document No. 57) is **DENIED.**

ALL OF WHICH IS ORDERED this 16th day of August 2007.

John Daniel Tinder, Judge
United States District Court

---

[21](...continued)
because the settlement agreement was structured as a periodic payment plan with a present value of less than the policy amount.)  Second, it is likely that Lewellen would be limited to $1.25 million for all claims he might bring related to his treatment at Schneck (the EMTALA claim and any medical malpractice claims) because there is only one injury in this case.  See Ind. Code § 34-18-14-3.  Therefore, any doctor liable under a medical malpractice theory would also be liable for an additional $250,000.  Lewellen is not really limited to $250,000, as he claims.

-43-

Copies to:

Magistrate Judge William G. Hussmann, Jr.

William David Bridgers
NEAL & HARWELL PLC
dbridgers@nealharwell.com

Gary J. Clendening
MALLOR CLENDENING GRODNER & BOHRER
gjclende@mcgb.com

Kristen Vanderkooi Dyer
NEAL & HARWELL PLC
kdyer@nealharwell.com

Philip Norman Elbert
NEAL & HARWELL PLC
pelbert@nealharwell.com

Christopher Charles Hagenow
HOPPER & BLACKWELL
chagenow@hopperblackwell.com

Kirk Robert Jocham
HALL RENDER KILLIAN HEATH & LYMAN
kjocham@hallrender.com

Belinda Rose Johnson
MALLOR CLENDENING GRODNER & BOHRER LLP
bjohnson@mcgb.com

Edward J. Liptak
CARSON BOXBERGER
liptak@carsonboxberger.com

Christopher L. Riegler
HALL RENDER KILLIAN HEATH & LYMAN
criegler@hallrender.com